**HARMAN MINING CORPORATION, a corporation, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, Secretary of Labor, Respondents.**

No. 81–1189.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 5, 1981.

Decided Dec. 24, 1981.

J. Peter Richardson, Robert M. Richardson, Bluefield, W. Va. (Richardson, Kemper, Hancock & Davis, Bluefield, W. Va., on brief), for petitioner.

Debra L. Feuer, U. S. Dept. of Labor, Washington, D. C. (T. Timothy Ryan, Jr., Sol. of Labor, Edward P. Clair, Acting Associate Sol., Michael A. McCord, Appellate Litigation, Washington, D. C., on brief), for respondents.

Before FIELD, Senior Circuit Judge, and HALL and SPROUSE, Circuit Judges.

PER CURIAM:

Harman Mining Corporation (Harman) has petitioned for review of a final order of the Federal Mine Safety and Health Review Commission. An inspector of the Mine Safety and Health Administration (MSHA) issued an order pursuant to

§ 103(k) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 813(k) (Act), requiring Harman's miners to withdraw from the scene of a fatal mine accident. The inspector also issued three citations against Harman for violating the standards set forth in 30 C.F.R. 77.1607(v), 77.1713, and 48.31. Harman contested the order and citations and following a hearing on the merits, an Administrative Law Judge upheld the order and the citations for violations of 30 C.F.R. 77.1607(v) and 77.-1713. The judge vacated the third citation against Harman. Harman filed with the Commission a petition for discretionary review of the judge's decision which the Commission declined to grant, and the judge's decision became the final order of the Commission. In its petition with this Court, Harman challenges the Commission's order insofar as it upholds the order requiring Harman to withdraw from the accident site and the citation for violation of 30 C.F.R. 77.1607(v).[1]

This controversy arose out of a "car dropping" accident at Harman's preparation plant which resulted in the death of an employee of the Norfolk and Western Railway Company. Harman's plant is located on a grade and a railroad track runs up to an area higher on the grade than the plant site. Three parallel tracks run from this high point down toward the plant, running along the side and under a part of the plant and continuing down the grade toward Norfolk and Western's storage area. The plant's loading station is located where the tracks run under the preparation plant, and the loading procedure involves a technique which is termed "car dropping".

At Harman's plant, car dropping works in the following way. Using a locomotive, Norfolk and Western pulls empty railroad cars to the point on the tracks above the plant. When the miners who load the coal onto railroad cars are ready for another car, a Harman car dropper rolls a car down the track to the plant's loading area. The car rolls down the track solely by the force of gravity and the car dropper stands on a platform at one end of the moving car and controls it by using a mechanical braking device. After the coal is loaded onto the car, another Harman employee drops it down to the storage area of Norfolk and Western. A railroad employee tells Harman's car dropper which track to use and at times it is necessary to operate a switch on the track to maneuver the cars from one track to another. This switching is done primarily by the Harman employees, but occasionally, if it is more convenient, a railroad employee performs the switching operation.

Norfolk and Western owns the railroad tracks, switches and road beds which it purchased from Harman. It also, of course, owns the railroad cars. Harman owns all of the land upon which the preparation plant is located, including the land on which the railroad siding tracks are maintained. Under the contract between Harman and Norfolk and Western, Harman is responsible for keeping the tracks free from coal and other debris.

The accident here in question occurred during the evening shift on February 8, 1980, and involved the loading and dropping of five railroad cars. On that shift, James Bennett was the Harman employee responsible for dropping cars from the preparation plant down to Norfolk and Western's storage area, and Bill McCoy was the Harman employee responsible for dropping empty cars down to the plant to be loaded. The loading and dropping of the first three cars was uneventful, and when McCoy dropped the number four car down to the loading site, its brakes appeared to be adequate. However, when he dropped the number five car, he discovered that it had no working brakes. Following an established procedure, McCoy marked the number five car with chalk which indicated that it had faulty brakes. Although he was aware that

1. 30 C.F.R. 77.1607(v) provides:
   Railroad cars shall be kept under control at all times by the car dropper. Cars shall be dropped at a safe rate and in a manner that will insure that the car dropper maintains a safe position while working and traveling around the cars.

it had no brakes, McCoy dropped it down to the loading site.

When Bennett came up to get the number four car, McCoy informed him that the number five car had no brakes, and directed that he delay dropping the number four car so that the number five car could be coupled to it and the two cars dropped together. Bennett started the two cars down the track, but despite his application of the brakes, the cars continued to pick up speed, and when Bennett found he was unable to control them, he jumped to the ground. The cars continued to travel at an accelerated speed and collided with three cars parked on the track, one of which ran over and fatally injured a Norfolk and Western employee who was engaged in coupling two of the cars.

■ Upon these facts Harman challenges the jurisdiction of MSHA to issue the citation and order in this case, asserting that its car dropping activities do not take place at a mine and, therefore, are not covered by the Act. Harman argues that the Act's definition of a mine covers only the immediate mining processes, beginning with the extraction of a mineral and ending when its preparation has been completed. Harman asserts that since the car dropping takes place after the coal already has been prepared, it does not take place at a "mine". Harman also contends that since Norfolk and Western owns the railroad tracks they are not a part of its mine. This argument fails to recognize, however, that Harman uses the facilities involved in car dropping and that under the statute's definition of a "mine" the facilities so used are part of Harman's mine. Further, Harman's argument is contrary to the broad definition of a "mine" as set forth in the Act. Section 3(h)(1) of the Act, 30 U.S.C. § 802(h)(1) defines a "mine" in the following language:

> "Coal or other mine" means (A) an area of land from which minerals are extracted * * * (B) private ways and roads appurtenant to such area, and (C) *lands * * facilities, equipment * * * or other property * * ** used in, or to be used in, or resulting from the work of extracting

such minerals from their natural deposits * * *, or *used in,* or to be used in the milling of such minerals, or *the work of preparing coal or other minerals, and includes custom coal preparation facilities.* [Emphasis added].

Under this definition, it is clear that a "mine" includes facilities and equipment "used" in the work of preparing coal.

Another definitional section of the Act indicates that the car dropping activities are covered. As we have noted, the facilities or equipment used in the "work of preparing coal" fall within the Act's definition of a "mine". Section 3(i), 30 U.S.C. 802(i) defines the phrase "work of preparing coal" as follows:

> "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing and loading of * * * coal * * *, and such other work of preparing the coal as is usually done by the operator of the coal mine.

Unquestionably Harman's car dropping activities are carried on incident to the loading and storage of its coal and therefore are part of the work done by Harman in preparing its coal for market. The fact that Norfolk and Western owns the siding tracks is immaterial since the undisputed evidence shows that Harman "uses" these tracks in its day to day operations.

The broad definition of a "mine" in the Act demonstrates that Congress intended that term to encompass all of the facilities used at a coal preparation plant. The legislative history confirms this congressional intent. The Conference Committee indicated that the Act broadly defines "mine"

> to include all underground or surface areas from which the mineral is extracted, and all surface facilities used in preparing or processing the minerals, as well as roads, structures, dams, impoundments, tailing ponds and like facilities related to the mining activity.

S.Conf.Rep.No.95–461, 95th Cong., 1st Sess. 38 (1977); Subcommittee of Labor of the Senate Committee on Human Resources, 95th Cong., 2d Sess., *Legislative History of*

the Federal Mine Safety and Health Acts of 1977 at 1316 (Comm. Print 1978) (hereinafter "Legislative History"). The Senate Committee on Human Resources stated:

█t is the Committee's intention that what is considered to be a mine and to be regulated under the Act be given the broadest possible interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act. S.Rep.No.95–181, 95th Cong., 1st Sess. 14 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3414; Legislative History 602.

The Act's sweeping definition, buttressed by the legislative history, supports the Commission's conclusion that the car dropping facilities and activities of Harman fall within its coverage. See Marshall v. Stoudt's Ferry Preparation Co., 602 F.2d 589 (3 Cir. 1979), cert. denied 44 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980).

█ In addition to its jurisdictional challenge, Harman contends that it would have been more appropriate for the Secretary to issue the citation and order against Norfolk and Western, as an independent contractor, than to issue them against Harman. Harman argues that Norfolk and Western supplied railroad cars with faulty brakes and thereby caused Harman's car dropper to lose control of the cars. Even assuming, however, that Norfolk and Western had some degree of culpability, the Secretary had discretionary authority to cite Harman for the violation.

The Act provides that "[t]he operator of a * * * mine in which a violation occurs * * shall be assessed a civil penalty by the Secretary * * * ". 30 U.S.C. § 820(a). The Act defines the term "operator" as "any owner, lessee, or other person who operates, controls, or supervises a * * * mine or any independent contractor performing services or construction at such mine". 30 U.S.C. 802(d). In Bituminous Coal Operators'

Ass'n. v. Secretary of Interior, 547 F.2d 240 (4 Cir. 1977), we held that under the 1969 Act,[2] mine owners are absolutely liable for the violations by independent contractors. Based upon our analysis of the statute, we held that the owner of a mine is liable "regardless of who violated the Act or created the danger." "In sum," we stated "we conclude that the Act does not prohibit the Secretary from holding a mining company and a construction company jointly or severally liable for violations committed by the construction company." 547 F.2d at 246–247. Upon the facts of the present case, we are of the opinion that the Secretary exercised his discretionary authority in an appropriate manner in issuing the order and citation against Harman.

For the foregoing reasons, the Order of the Commission is affirmed.

AFFIRMED.

---

2. Cases construing whom the Secretary of the Interior may cite under the Coal Act for independent contractors' violations have continuing validity under the Mine Act. When Congress amended the Coal Act, and renamed it the Mine Act, Congress explicitly included independent contractors, for the first time, in the definition of operator. However, the substantive effect of that amendment was merely to ratify the previous judicial construction of the Coal Act's definition of operator. Association of Bituminous Contractors, Inc. v. Andrus, 581 F.2d 853, 862 (1978).