Raymond J. DONOVAN, Secretary of Labor, Petitioner,

v.

CAROLINA STALITE COMPANY, Respondent.   (Two cases.)

Nos. 82–1467, 82–1830.

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 1983.

Decided May 15, 1984.

Linda L. Leasure, Atty. Dept. of Labor, Washington, D.C., with whom Cynthia L. Attwood, Associate Sol., and Michael A. McCord, Atty., Dept. of Labor, were on brief, for petitioner.

William C. Kluttz, Jr., Salisbury, N.C., with whom Lewis P. Hamlin, Jr., Salisbury, N.C., was on brief, for respondent.

Before WRIGHT, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

These actions arise from the Secretary of Labor's attempt to assess civil penalties against the Carolina Stalite Company for violations of the Federal Mine Safety and Health Act and the mandatory safety standards for sand, gravel, and crushed stone operations set forth in 30 C.F.R. Part 56 (1983). The Federal Mine Safety and Health Review Commission, reversing the administrative law judge, held that penalties could not be imposed. The principal issue on appeal is whether Carolina Stalite's facility constitutes a "mine" within the meaning of section 3(h) of the Act, 30 U.S.C. § 802(h) (1982). We conclude that it does. Since we reject respondent's other contentions as well, we reverse.

### I.

Carolina Stalite owns and operates a slate gravel processing facility on property immediately adjacent to a quarry owned and operated by the Young Stone Company in Gold Hill, North Carolina. Stalite and Young are independent corporations and no business relationship exists between the two companies other than that of buyer and seller. Approximately 30% of the stone quarried by Young is delivered to Stalite by means of a conveyor system. The conveyors are owned, operated, and maintained by Young, and Young, as the operator of a quarry, is subject to the Mine Act. Stalite "bloats" the slate in a rotary kiln with intense heat. Respondent uses the unregistered trade name "stalite" to refer to the light-weight material thus created. The stalite is crushed and sized by the company and is sold primarily to be used in making concrete masonry blocks.

In October of 1978, Charles Blume, the Secretary's authorized representative, arrived at the Carolina Stalite facility to inspect the plant pursuant to section 103(a) of the Act.[1] Following standing instructions from his superiors, the assistant su-

---

1. Section 103(a) provides, in pertinent part:
   Authorized representatives of the Secretary ... shall make frequent inspections and investigations in coal or other mines each year for the purpose of ... (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person.... For the purpose of making any inspection or investigation under this chapter, the Secretary

perintendent of the plant denied Blume entry. Blume returned later that day and met with the plant superintendent who also denied the inspector entry. Blume then issued Stalite a citation.[2] The following morning, Blume returned to the plant and informed the superintendent that unless he were allowed to inspect the plant, he would immediately issue a closure order shutting down the facility.[3] Blume delayed this threatened action long enough to permit notification of the company's managing partner who arrived at the plant later in the morning accompanied by counsel. On their arrival, however, Blume renewed the closure threat. Company counsel requested two work days to familiarize himself with the provisions of the Mine Act but both Blume and his supervisor, who was reached by telephone, denied the request. Carolina Stalite then allowed the inspection which, along with subsequent inspections, resulted in 133 citations and orders, including the citation issued for the initial refusal to admit the inspector into the plant.

The Secretary moved to assess civil penalties against Carolina Stalite in proceedings before an administrative law judge of the Federal Mine Safety and Health Review Commission. Stalite moved for summary dismissal on jurisdictional grounds, arguing that its facility, not being a "mine", was not covered by the Act. The company also claimed that the evidence acquired during the several inspections was illegally obtained and must be suppressed.

The ALJ ruled that Carolina Stalite's facility was a "mine" under section 3(h)(1)(C) of the Act, which defines a "mine" as including, among other things, lands, "slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property ... used in, or to be used in, *the milling ... or the work of preparing* coal or other minerals ...." 30 U.S.C. § 802(h)(1)(C) (1982) (emphasis added). The ALJ stated that the dispositive question is whether Stalite engages in mineral milling and preparation, subjecting the company to MSHA jurisdiction, or whether the company operation is "primarily manufacturing in nature," and thus subject to regulation by the Occupational Safety and Health Administration. Joint Appendix ("J.A.") at 30, 32. *See also* 111 Cong.Rec. 22,815–816 (1965) (setting up distinction between milling and preparation, on the one hand, and manufacturing on the other). Because mineral milling and preparation are not specifically defined in the Act, the ALJ

... shall have a right of entry to, upon, or through any coal or other mine.
30 U.S.C. § 813(a) (1982).

**2.** Section 104(a) states:
If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator.... In addition, the citation shall fix a reasonable time for the abatement of the violation....
30 U.S.C. § 814(a) (1982). Refusal to admit an authorized representative into a facility for purposes of conducting an inspection pursuant to § 103(a) is a violation of the Act. *See, e.g., Marshall v. Donofrio*, 465 F.Supp. 838, 839 (E.D. Pa.1978), *aff'd mem.*, 605 F.2d 1196 (3d Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *Secretary of Labor v. Waukesha Lime & Stone Co.*, 3 F.M.S.H.R.C.

1702, 1703–04 (1981); *Secretary of Labor v. Baker Coal Co.*, 2 F.M.S.H.R.C. 2626, 2628 (1980).

**3.** Section 104(b) provides:
If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) of this section has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that the period of time for the abatement should not be further extended, *he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons ... to be withdrawn from, and to be prohibited from entering, such area* until an authorized representative of the Secretary determines that such violation has been abated.
30 U.S.C. § 814(b) (1982) (emphasis added).

gave considerable deference to an interagency agreement and memorandum of understanding between MSHA and OSHA.[4] Those documents set out, to a certain extent, each agency's jurisdiction and identify several explicit examples of mineral milling and preparation processes considered to fall within Mine Act jurisdiction. Three of those processes—heat expansion, crushing, and sizing—"exactly describe the Stalite [operation]." J.A. at 31.

The ALJ determined that the interagency agreement was consistent with the legislative intent that the Act's definition of a "mine" be broadly interpreted, and that Carolina Stalite was engaged in mineral processing within the meaning of the Act. J.A. at 31–32. Because the legislative history of the Act "clearly contemplate[d] that jurisdictional doubts be resolved in favor of Mine Act jurisdiction," *id.* at 32, the ALJ concluded that "inclusion of [Stalite's] operations within the coverage of the Mine Act" was proper. *Id.* at 33. Finally, the ALJ rejected Stalite's contention that the evidence of violations must be suppressed under the fourth amendment. *Id.* at 35–48.[5]

Pursuant to agency rules, Carolina Stalite petitioned the full Commission for discretionary review of the ALJ's decision. The petition was granted, and on March 29, 1982, a divided Commission reversed the ALJ and held that Stalite's facility did not constitute a mine within the meaning of the Act.[6] The Commission majority initially acknowledged that a "broad interpretation [was] to be applied to the Act's expansive definition of a mine." J.A. at 83 (citation omitted). *See also id.* at 83 n. 4 (use of both "milling" and "preparation" in the definition of a mine "signals that an expansive reading is to be given to mineral processes covered by the Mine Act"). Nonetheless, the Commission majority read that definition narrowly to include only facilities that engage in the "extraction, milling *and* preparation of minerals" and concluded that Carolina Stalite did not engage in mining "in *its classic sense.*" *Id.* at 83 (emphasis added). The Commission found persuasive the fact that Stalite and the Young Stone Company were nonaffiliated companies and that Young did the actual extraction of the slate. Stalite's contact with the mineral occurred only after Young had extracted, crushed, sold and delivered it. *Id.* at 84. According to the Commission then, "Carolina's treatment of the mineral [was] a manufacturing process that results in a product, rather than a 'milling' process under the Mine Act." *Id.*[7]

The Commission refused to give any weight to the interagency agreement between MSHA and OSHA used by the ALJ to support his interpretation of the statute. According to the Commission, the question of "MSHA's authority to regulate a workplace is determined by the scope of the

---

4. The interagency agreement was originally reported in 39 Fed.Reg. 27,382 (1974), and the current agreement is published in 44 Fed.Reg. 22,827 (1979).

5. The ALJ subsequently vacated several citations, affirmed the rest, and assessed a cumulative penalty of $14,542 against the company. J.A. at 52–53.

6. The dissent endorsed the result and the reasoning of the ALJ's decision in full. J.A. at 85–90 (Lawson, C., dissenting). The Commission majority did not reach Carolina Stalite's fourth amendment challenge. *Id.* at 82 n. 2.

   Because the Commission held that Stalite did not fall within Mine Act coverage, the cases consolidated on appeal in No. 82–1830, which involved similar citations, orders and penalty proposals but were assigned to a different administrative law judge, were dismissed by that judge. J.A. at 92.

7. The crushing and sizing of the slate performed by Carolina Stalite were, according to the Commission, "simply final steps in the manufacture of the product." J.A. at 84. The Commission did not explain its conclusion that only "crushing [the mineral] incident to extraction would appear to comprise ... 'mining' under the Act." *Id.* at 83. Finally, although the Commission rested its conclusion primarily on the fact that Carolina Stalite and Young were separate corporate entities, it offered no authority to explain why that fact should be given such great weight.

Mine Act's coverage, not by its agreement with OSHA." J.A. at 84.[8]

This appeal followed. Our jurisdiction rests on section 106(b) of the Act, 30 U.S.C. § 816(b) (1982).

## II.

■ We think the conclusion that Carolina Stalite's plant is subject to Mine Act jurisdiction compelled by construction of the statute and supported by decisions of other circuits.

### A.

It is clear that every company whose business brings it into contact with minerals is not to be classified as a mine within the meaning of section 3(h). The jurisdictional line drawn by the statute rests upon the distinction, which is somewhat elusive, to say the least, between milling and preparation, on the one hand, and manufacturing, on the other. Classification as the former carries with it Mine Act coverage; classification as the latter results in Occupational Safety and Health Act regulation.

Were we governed by ordinary English usage, we might well agree with the Commission. Carolina Stalite does not extract the slate it processes and, as the Commission said, its facility cannot be considered a "mine in the classic sense." However, neither does Carolina Stalite manufacture concrete masonry blocks, the primary end use for stalite, and it is by no means perverse to characterize the Stalite facility as a mine. The physical proximity and operational integration of Carolina Stalite and Young Stone, whose plant is unquestionably subject to the Act, permit those facilities to be viewed, in industrial and economic reality, as distinct from questions of

legal title to the premises, as a unified mineral processing operation. That consideration makes less artificial the statute's clear classification of Carolina Stalite's facility as a mine.

Section 3(h)(1)(C) of the Mine Act includes within the definition of a mine all facilities engaged in "the milling ... or the work of preparing coal or other minerals." 30 U.S.C. § 802(h)(1)(C) (1982). Comparing the statute with prior laws that employed these terms separately, the Commission correctly noted that the "use of both terms signals that an expansive reading is to be given to [the] mineral processes covered by the Mine Act." J.A. at 83 n. 4. "Milling" and "preparation" are broad terms but they do not, on their face, appear to include the process of extracting a mineral substance. The Commission itself recognized this, observing that " 'milling' and 'preparation' can be perceived as words used, in a loose sense, interchangeably to describe the entire process of treating *mined* minerals for market." *Id.* (emphasis added).

The Commission construed the statute, nevertheless, to require a company actually to extract a mineral before being subject to Mine Act jurisdiction. The Commission stated that "[t]he Act classifies as mining, and therefore subjects to its coverage, the extraction, milling *and* preparation of minerals." J.A. at 83 (emphasis added) (footnote omitted). *See also id.* ("crushing performed incident to extraction would appear to comprise 'milling', and therefore 'mining', under the Act"). Carolina Stalite similarly urges a limited application of those terms, subjecting to Mine Act coverage only those facilities which engage in mineral milling and preparation in conjunction with the initial extraction of the mineral.

---

8. The Commission also concluded that the statute's requirement that administrative convenience be considered by the Secretary when defining mineral milling was not applicable in this case:

> We note that section 3(h)(1) of the Mine Act, regarding the Secretary of Labor's determination as to what constitutes mineral mill-

ing, does not come into play. That provision allows the Secretary to determine which of his agencies will conduct inspections in cases of dual or *overlapping* jurisdiction. That situation is not presented here.

J.A. at 84 (citations omitted) (emphasis in original).

*See* Brief for Respondent at 8 (the definition of preparation "extends no further than to activities conducted by a [mine] operator to ready the extracted mineral for sale to a primary user"). This reading restricts the scope of the Act contrary to both the statutory text and much of its legislative history.

Section 3(h) does not mandate, by its own terms, the reading urged upon us by Carolina Stalite and the Commission. If anything, section 3(h)'s mandate runs the other way. That section, as we have noted, defines a "mine" as including "structures" and "facilities" used in "milling" or "the work of preparing ... minerals." It does not require that those structures or facilities be owned by a firm that also engages in the extraction of minerals from the ground or that they be located on property where such extraction occurs.

Other aspects of section 3(h) also suggest that the Secretary's construction of the Act is to be preferred. The last sentence of section 3(h)(1) states:

In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment.

30 U.S.C. § 802(h)(1) (1982). This language does two things. It gives the Secretary discretion, within reason, to determine what constitutes mineral milling, and thus indicates that his determination is to be reviewed with deference both by the Commission and the courts.[9] The quoted text also gives the Secretary guidance concerning one criterion to be employed in exercising his discretion.

We have before us just the sort of determination the Secretary was empowered by Congress to make. That determination is well within the bounds of reasonableness, given the statute's definition of a "mine", and we accord it the deference it deserves. The Commission, so far as we can see, gave the Secretary's determination no deference, and we believe that was error. For the same reason, we think the Commission was wrong when it concluded that the interagency agreements and memorandum of understanding between the Secretary's two agencies, MSHA and OSHA,

merely reflect the views of the agencies as to their respective jurisdiction. Simply because the agencies may agree between themselves as to which agency will inspect a particular business establishment does not insulate their determination from judicial review. MSHA's authority to regulate a workplace is determined by the scope of the Mine Act's coverage, not by its agreement with OSHA.

J.A. at 84. These documents, while not dispositive, assist our resolution of the jurisdictional question. Section 3(h) specifically contemplates, and, moreover, depends in part, on "the agencies ... agree[ing] between themselves as to which agency will inspect a particular business establishment." That language alone compels us to consider the Secretary's determination of the Act's jurisdictional scope as expressed in these agreements. The interagency agreement suffers, as the Commission observed, from a degree of internal inconsistency. *See* J.A. at 84. Nevertheless, in conjunction with the statutory text and what we draw from the legislative history, as discussed below, we find relevant the agreement's list "of milling processes ...

---

**9.** The ALJ recognized and gave appropriate weight to the "years of experience inspecting mining and milling operations, and ... the opportunity to develop an expertise" possessed by the Secretary, MSHA, and its predecessors. J.A. at 33. In this highly technical area deference to the Secretary's expertise is especially appropriate. *See Magma Copper Co. v. Secretary of Labor,* 645 F.2d 694, 696–98 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *National Industrial Sand Ass'n v. Marshall,* 601 F.2d 689, 703 (3d Cir.1979).

which MSHA has authority to regulate." 44 Fed.Reg. 22,828, 22,829 (1979). That listing provides that

> milling consists of *one or more* of the following processes: *crushing*, grinding, pulverizing, *sizing*, concentrating, washing, drying, roasting, pelletizing, sintering, evaporating, calcining, *kiln treatment*, sawing and cutting stone, *heat expansion*, retorting (mercury), leaching, and briqueting.

*Id.* at 22,829 (emphasis added).[10] *See also* J.A. at 87 (Lawson, C., dissenting).

The Commission also took the position, without elaboration, that the convenience-of-administration provision of section 3(h) did "not come into play" because Carolina Stalite was not subject to "dual or overlapping jurisdiction." J.A. at 84 (emphasis omitted). This interpretation is puzzling because, under the Commission's restrictive interpretation of a "mine" as an enterprise that extracts the minerals it processes, it is difficult to see how overlapping jurisdiction could occur. In any event, the Commission failed to recognize that "convenience of administration," which is a broader concept than the need to eliminate overlapping jurisdiction, is to be considered by the Secretary in defining the Act's scope. Section 3(h) gives the Secretary power—in situations such as this, where the company's operations do not fall exclusively within the province of either mineral "milling" or "manufacturing"—to decide which of his agencies will possess enforcement authority over the facility in question. Because Young is undisputably subject to MSHA regulation, the Secretary acted well within his statutory authority in adjusting the administrative burdens between his various agencies to reflect the convenience of regulating an integrated physical establishment under one statutory scheme.[11]

The legislative history, though not free from contradictory statements,[12] tends,

---

**10.** On the other hand, the agreement suggests the essential component of all milling operations is the "separation of one or more valuable desired constituents of the crude from the undesired contaminants with which it is associated," 44 Fed.Reg. 22,829 (1979), something Carolina Stalite admittedly does not do. The agreement, however, seems to have anticipated the difficulty in classifying operations like Stalite's and cautions us, in particularly apt language, that "[n]otwithstanding the clarification of authority provided by [this agreement], there will remain areas of uncertainty regarding the application of the Mine Act, *especially in operations near the termination of the milling cycle and the beginning of the manufacturing cycle.*" *Id.* at 22,828 (emphasis added). Precisely because the interagency agreement can be read, alternately, as including or not including Carolina Stalite within Mine Act coverage, we reject respondent's position, *see* Brief for Respondent at 17, that it was entitled to rely upon its own interpretation of the agreement to insulate itself from Mine Act jurisdiction.

**11.** Our interpretation of this part of § 3(h) is, moreover, more consistent with the legislative history cited by the Commission to support its view. The final conference report states only that the Act "authorized the Secretary, in cases of *possible* overlapping jurisdictions between the [MSHA] and OSHA, to assign enforcement responsibilities to a single agency." S.Rep. No. 461, 95th Cong., 1st Sess. 38 (1977) (emphasis

added). This reference seems, to us, to be clearly aimed at situations posed by companies like Carolina Stalite whose business activities put it somewhere between a company engaged in the actual extraction of minerals it thereafter processes, and one engaged in purely manufacturing operations.

**12.** There is, concededly, some legislative history that might, at first glance, suggest a view contrary to that which we take. In the House of Representatives, Mr. Patten asked if Mine Safety and Health Administration jurisdiction would end once minerals entered transport.

> Mr. PATTEN: Would [the Mine Safety and Health Act] have anything to do with it under the mining operation, once they started to transport? Do I understand this [Act] will have nothing to do with that?
> Mr. GAYDOS: No. This pertains only to extraction of materials from mines below or above ground.

123 Cong.Rec. 23,161 (1977) (remarks of Reps. Patten and Gaydos). This exchange is taken out of context by Carolina Stalite. Representative Patten had interrupted a general explanation of the Act and asked whether it covered the truck and rail transportation of dangerous materials that had been mined, a subject far from the Act's concerns. The two legislators were not engaged in a careful exposition of the Act's jurisdictional scope. The response given, in any event, is clearly incorrect since it is apparent,

rather strongly, to support the Secretary's view of the Act's reach. Because the Act was intended to establish a "single mine safety and health law, applicable to *all mining activity,*" S.Rep. No. 461, 95th Cong., 1st Sess. 37 (1977) (emphasis added), its jurisdictional bases were expanded accordingly to reach not only the "areas ... from which minerals are extracted," but also the "structures ... which are used or are to be used in ... the preparation of the extracted minerals." S.Rep. No. 181, 95th Cong., 1st Sess. 14 (1977), U.S.Code Cong. & Admin.News 1977, 3401, 3414. *See also* S.Rep. No. 461, *supra,* at 38 (the bill "broadly defined mine to include ... all surface facilities used in preparing or processing the minerals"). Section 3(h) thus "contains amendments to the definitions in the [predecessor statute] which reflect ... the broader jurisdiction of th[e] Act." S.Rep. No. 181, *supra,* at 14, U.S.Code Cong. & Admin.News 1978, at 3414. The Senate Report also said: "The Committee notes that there may be a need to resolve jurisdictional conflicts, but it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the *broadest possibl[e] interpretation.*" *Id.* (emphasis added). Close jurisdictional questions are to "be resolved in favor of inclusion of a facility within the coverage of the Act." *Id.*

Given the statute's text and history, we find it impossible to disagree with the Secretary's determination that Carolina Stalite is subject to the Mine Act.

### B.

Cases decided by the Third, Ninth, and Fourth Circuits accord with our interpretation of the Act, and uniformly recognize section 3(h)'s "sweeping definition" of a mine.

In *Marshall v. Stoudt's Ferry Preparation Co.,* 602 F.2d 589 (3d Cir.1979), the

state of Pennsylvania dredged a river and deposited the material extracted from the riverbed into a nearby basin. Stoudt's Ferry then purchased the dredged refuse and transported it to the company's plant with a front-end loader and a conveyor belt. At the plant, Stoudt's Ferry separated a usable fuel from the refuse through a "sink and float" process. The Third Circuit specifically rejected the argument that a business cannot be "included within the Act's ambit because [its] activities are not related to the extraction of minerals from natural deposits or their preparation after extraction." *Id.* at 592. The court concluded that Stoudt's Ferry fell within section 3(h) because it operated a "structure and a facility on the surface used in the work of preparing ... minerals." *Id.* (citations omitted). The work of preparing minerals, the court held, is subject to Mine Act jurisdiction "whether or not extraction is also being performed by the operator." *Id.* In language that might have been written for Carolina Stalite, the court stated:

> Although it may seem incongruous to apply the label "mine" to the kind of plant operated by Stoudt's Ferry, the statute makes clear that the concept that was to be conveyed by the word is *much more encompassing than the usual meaning* attributed to it—the word means what the statute says it means.

*Id.* (footnote omitted) (emphasis added).

The Ninth Circuit took a similar view in *Cyprus Industrial Minerals Co. v. Federal Mine Safety & Health Review Commission,* 664 F.2d 1116 (9th Cir.1981). There, the petitioner argued, unsuccessfully, that its operation was not a mine "because the work under way consisted of driving exploratory drifts [into a hill] in search of a commercially exploitable deposit of talc rather than in the extraction of minerals." *Id.* at 1117. Though this activity constituted mining even in the conventional sense,

and conceded by everyone, that whatever the Act's scope, more is reached than mere extrac-

tion.

the court endorsed *Stoudt's Ferry's* broad view of the statute, recognizing its duty to interpret "remedial statutes ... broadly to 'best effectuate' the Congressional purpose." *Id.* at 1118 (citing *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980)).

*Harman Mining Corp. v. Federal Mine Safety & Health Review Commission*, 671 F.2d 794 (4th Cir.1981), involved an activity known as "car dropping", a method of loading already extracted and prepared coal into railroad cars for transportation. *Id.* at 795. The petitioner took the position—closely akin to that taken by Carolina Stalite, *see* Brief for Respondent at 8—that the Act's definition of a mine "covers only the immediate mining processes, beginning with the extraction of a mineral and ending when its preparation has been completed." 671 F.2d at 796. Because the "car dropping" took place after the coal had already been prepared, the company argued that it did not take place at a mine. *Id.* The court noted that "Harman's argument is contrary to the broad definition of a 'mine' as set forth in the Act," and held that "a 'mine' includes facilities and equipment 'used' in the work of preparing coal." *Id.* (citing section 3(h)(1)(C), 30 U.S.C. § 802(h)(1)(C)).

Unable to cite case law to support its position, Carolina Stalite attempts to distinguish each of these cases on their facts. *See* Brief for Respondent at 18–21. We think, however, that the facts of *Stoudt's Ferry* and *Harman Mining*, while different, do not make the cases distinguishable in principle, and the reasoning of the courts in all three cases supports the result we reach.

## III.

■ Carolina Stalite contends, even if jurisdiction is proper under the Act, that the evidence obtained during the several inspections of its facility must be suppressed on fourth amendment grounds. The warrantless inspection feature of the Mine Act was upheld by the Supreme Court in *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). The Court stated that "a warrant requirement could significantly frustrate effective enforcement of the Act" and held that "the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." *Id.* at 603, 101 S.Ct. at 2540.

Carolina Stalite argues, however, that *Dewey* is necessarily qualified by the earlier decision in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978). The Supreme Court there struck down a warrantless search provision in the Occupational Safety and Health Act because the provision left "unbridled discretion" in the executive and administrative officers. The company rephrases *Barlow's* holding so that, before a facility may be subject to the warrantless search provisions of the Mine Act, the "affected industry must be defined with such certainty that the owner has a real expectation that his operation is covered under the Act." Brief for Respondent at 23.[13]

Stalite asks us, in effect, to create an exception to the *Dewey* Court's rule for industries—like itself—alleged to fall within a "gray area" of coverage under the Act. Requiring a warrant in such cases would be proper, the argument goes, because the operator could have "no real expectation that his property will from time to time be inspected by government officials." *Dewey*, 452 U.S. at 599, 101 S.Ct. at

---

**13.** At least one commentator has recognized, however, that the approach in *Dewey* was "certainly a marked contrast from the posture of the Court in *Barlow's.*" W. LaFave, *Search and Seizure* § 10.2, at 99 (Supp.1984). The shift in emphasis was also remarked by some members of the Court. *See* 452 U.S. at 607, 101 S.Ct. at 2542 (Stevens, J., concurring) ("the rationale of [the *Dewey*] decision is much closer to the reasoning in my [*Barlow's*] dissent than to the reasoning in the majority opinion in" that case); *see also* 452 U.S. at 609–14, 101 S.Ct. at 2543–46 (Stewart, J., dissenting). In these circumstances, we are hesitant to accept Stalite's argument that *Barlow's* qualifies *Dewey*.

2538. Whatever else may be said against the proposed exception, the evidence in this case would not support its application to respondent. The ALJ found, and it is not disputed, that Carolina Stalite's management had issued standing instructions to the plant personnel "to refuse entry to MSHA inspectors." J.A. at 36. *See also* J.A. at 16 (Blume Dep.). Furthermore, since 1971, Stalite "ha[d] been regularly inspected and regulated under the Metal Act," *id.* at 48, one of the Mine Act's predecessor statutes. The company clearly had notice of MSHA's potential claim of regulatory power under the Act.

■ Respondent also contends that Blume's threat to close its facility was a threat to exercise authority not legally possessed by the inspector under the Act. Stalite argues, therefore, that its consent to the inspection was not an effective waiver of the company's fourth amendment rights. According to Stalite, Blume's only recourse when denied admittance to the mill was to seek, in a civil action, an injunction against future refusals. His threat to close the mill, it is said, rendered the subsequent search forcible and thus unconstitutional.[14] We must, according to Stalite, exclude "the evidence obtained during the ensuing inspections [as] the fruits of an unlawful search." Brief for Respondent at 26.

We find, to the contrary, that Stalite's consent to the search was fully effective. This question is determined by viewing the company's consent in the "totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The evidence undeniably shows that Stalite had ample warning that an inspection was likely and so had more than adequate time to familiarize itself with the Act's procedures and its own rights. Stalite had long been subject to regulation by MSHA's predecessor agency under the predecessor statute and it had been inspected by that agency. J.A. at 43 n. 8. More important, Stalite had anticipated the arrival of one in Blume's capacity, as shown by Stalite's standing instructions to its employees to deny entry to MSHA inspectors. Moreover, Stalite had, when the inspection finally occurred, an additional 24 hours from the time Blume first arrived at the plant to inform itself of the Act's protections. We must assume that Stalite either did not trouble to inform itself, despite its determination to turn MSHA inspectors away, or, that having studied the Act, the company's representatives concluded that Blume accurately described the Act's operation. We note that both upper level management and company counsel were present when Blume explained his understanding of the Act's procedures and they were, in fact, the Stalite representatives who actually consented to the search. *See generally United States v. Wellins*, 654 F.2d 550, 555–57 (9th Cir. 1981).

The Act undeniably gives MSHA inspectors coercive powers to gain entry for inspections. Blume's mistake, if he made one at all, was that he misidentified the form in which those powers could be asserted. Regardless of the form those powers took, however, it was obvious that they could not deprive Stalite of an opportunity to be heard in court prior to the search. Whether Blume issued a closure order, which would have to be judicially enforced, or, whether he was required to seek injunctive relief, Stalite would have "an adequate forum ... to show that a specific search [was] outside the federal regulatory au-

---

**14.** Blume first requested entry to the Carolina Stalite facility at 9:00 a.m. on October 17, 1978; the threat to issue a closure order was not made until the following morning, and the initial inspection itself did not take place until the company's managing partner and counsel arrived at the plant and had been consulted. J.A. at 36. Stalite's argument, even if accepted, would only apply to the initial inspection of the company's mill, and, while the record is not conclusive on this point, it appears that a number of citations affirmed by the ALJ were issued after later inspections.

thority or to seek ... an order accommodating any unusual privacy interests that [it] might have." *Donovan v. Dewey*, 452 U.S. at 604–05, 101 S.Ct. at 2540–41. Stalite has never asserted, nor would such an assertion be credible, that the company thought Blume had the power to enter the mill and close it himself. Responsible representatives of the company, who had more than enough time to inform themselves of their rights and MSHA's powers, voluntarily waived the right to force MSHA to go to court to gain entry to the plant. That defeats Stalite's fourth amendment contention.

## IV.

■ Respondent's final argument is that a funding limitation on MSHA for fiscal year 1982, incorporated into H.J.Res. 370, and enacted nearly 30 months after the Secretary initially sought to assess civil penalties in this case, barred the Secretary from appealing the Commission's order.[15] The restriction on MSHA expenditures prohibited the obligation or expenditure of MSHA funds to "enforce any standard, rule, regulation or order under the ... Act with respect to any person engaged in the surface mining of stone, ... sand, or gravel ...." H.R. 4560, 97th Cong., 1st Sess. (1981). According to Stalite, the "sole issue ... is whether any MSHA appropriations were used to enforce an order at a time when the prohibition against such use was in effect." Brief for Respondent at

29. Because, respondent argues, "[i]t is inconceivable that this appeal could be taken without consultation and action by MSHA personnel," *id.*, this court must dismiss the petition.

Acceptance of this argument would have bizarre results. MSHA had funding authority for enforcement at the time of the plant inspections and the issuance of the citations. It had funding authority when the case was before the ALJ and when an appeal was taken to the Commission. MSHA once more had funding authority when this appeal was argued to us, but, and this is the point Stalite would make dispositive, not when the petition for review was filed in this court. Congress' temporary suspension of enforcement authority, if it were interpreted to void this appeal, would thus have the odd result that a company subject to the Mine Act when its violations were discovered, and subject to the Act now, would escape liability because of a temporary suspension when one procedural step in an appellate process was taken. One would suppose that, if Stalite were petitioning for review of an adverse decision by the Commission, the company could, with equal plausibility, argue that the Secretary's briefs should not be read by the court because, if the funding suspension had been observed, those briefs would have been filed out of time.

■ Fortunately, the view we take of the funding suspension avoids the need to entertain such conundrums. The appropri-

---

**15.** H.J.Res. 370, 95 Stat. 1183 (1981), was a continuing appropriations bill providing funding for fiscal year 1982 to several agencies and departments of the government. Whatever enforcement powers it took from MSHA were returned to the agency when Res. 370 was superseded seven months later by a supplemental appropriations bill. H.R. 6685, § 204, 96 Stat. 180, 192 (1982).

No provisions of the resolution expressly limited MSHA authority to enforce the Mine Act as to surface mine operations. *Cf.* H.J.Res. 370, § 132, 95 Stat. 1199 (1981) (prohibiting MSHA from expending funds to enforce the Act with respect to (1) independent contractors engaged in non-mine related construction on mine site, and (2) any state or political subdivision there-

of). However, the resolution did incorporate certain funding restrictions and grants of authority found in individual appropriations bills that had not been enacted. *See* H.J.Res. 370, § 101(a)(3), 95 Stat. 1183 (1981). Both parties here assume that Res. 370 incorporated the restrictions on MSHA expenditures found in H.R. 4560, as amended by the House of Representatives, that apply to surface mine operators. While we have some doubt about this assumption, because we reject Stalite's argument on other grounds, we assume for purposes of this appeal only, that Res. 370 had the effect the parties ascribe to it.

**1558**

ation rider applied only to MSHA appropriations. It did not affect the Secretary's activities or those of the Office of the Solicitor of Labor, which bears primary responsibility for conducting this appeal and which is funded by a separate appropriation account. MSHA personnel may have answered the Solicitor's questions about the case but we do not think such peripheral involvement with appellate attorneys can be said to fall within the concept of "enforcing" an order. This is particularly true because of the established rule that, when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly. *See United States v. Langston,* 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164 (1886). Such measures have the "limited and specific purpose of providing funds for authorized programs." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). Resolution 370 did not otherwise vitiate the force of the original authorization. Mine operators subject to the Act remained under the same substantive legal obligations; the implementing standards and regulations promulgated under the Act remained in force; and the statutory basis for enforcement litigation remained in effect. Resolution 370 was the beginning of an effort by some members of Congress to shift surface operations from MSHA to OSHA jurisdiction. That effort ultimately did not succeed and we think it would be wholly unreasonable to suppose that Congress intended a temporary suspension to wreak the procedural havoc with ongoing appeals that Stalite urges. We interpret Resolution 370 to indicate only Congress' intent that MSHA initiate no new enforcement litigation. Pending litigation matters could not have been affected. Any other reading of the enactment would stretch its language, violate principles of construction, and produce most inequitable results.

These consolidated cases are thus remanded to the Commission for proceedings not inconsistent with this opinion.

*So ordered.*