Dilip K. PAUL, Petitioner,

v.

FEDERAL MINE SAFETY AND
HEALTH REVIEW
COMMISSION, Respondent,

PB–KBB, Inc., Intervenor.

No. 85–1801.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1986.

Decided Feb. 27, 1987.

Robert M. Wood, for petitioner.

Anson D. Phipps, Houston, Tex., for intervenor, PB–KBB, Inc.

L. Joseph Ferrara, Acting Gen. Counsel, Federal Mine Safety and Review Com'n, Washington, D.C., entered an appearance for respondent.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL,* Senior District Judge.

Opinion for the Court filed by Senior District Judge WILL.

WILL, Senior District Judge:

Petitioner Dilip K. Paul seeks review of a decision by the Federal Mine Safety and Health Review Commission ("Commission") holding that he is not a "miner" within the meaning of § 3(g) of the Federal Mine Safety and Health Act ("Mine Act" or "Act"), 30 U.S.C. § 802(g), and that he has no standing to sue under § 105(c)(1) of the Act, 30 U.S.C. § 815(c)(1). For the reasons stated below, we affirm.

I.

Paul is a professional mining engineer who was employed by PB–KBB, Inc., an engineering firm. In 1981, PB–KBB became involved in an experimental program for the underground storage of nuclear

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

waste. The project, known as the Exploratory Shaft Facility ("ESF"), was sponsored by the Department of Energy and overseen by the Department's agent for the project, the Battelle Memorial Institute ("Battelle"). Battelle contracted with PB–KBB to plan and design the ESF. Under the contract, PB–KBB agreed to provide professional engineering services to prepare designs for the construction of the exploratory shafts.

The ESFs were designed to permit testing of underground salt formations as a medium for storing nuclear waste. The plan was to have three ESFs ranging in depth from 2200 to 3000 feet. After the initial testing, one ESF was to be enlarged by the extraction of approximately five million cubic feet of salt. This space was then to begin receiving nuclear waste. At the time of oral argument, the final site selection for the construction project had not yet been made.

Paul worked at PB–KBB's Houston, Texas office. He was assigned to conduct a study of the proposed shaft's ventilation system. The design criteria furnished by Battelle stated that the project was subject to the Mine Act and that the ventilation system would comply with the mandatory safety standards for underground mines, 39 C.F.R. pt. 57, promulgated under the Act. During the course of the study, Paul concluded that Battelle's design criteria were inconsistent with the federal standards. In Paul's opinion, these inconsistencies posed potential safety hazards. Paul was also concerned about potential liability from unsafe conditions at the ESFs.

Paul's supervisors disagreed with his interpretation of the regulations and the disagreement led to Paul's removal from the ESF project. Subsequently, Paul wrote a memorandum to his supervisors setting forth his position on the project's noncompliance with the federal standards. Twelve days later, on August 18, 1982, Paul was fired from PB–KBB. PB–KBB said the firing was due to Paul's incompetence and lack of productivity; Paul, in a complaint filed with the Secretary of Labor, claimed that the firing was in reprisal for his stand on the project's potential safety hazards.

The Secretary of Labor denied Paul's claim, finding that Paul did not work in a "mine" as defined in § 3(h)(1) of the Act. Paul then filed an action before the Commission under 30 U.S.C. § 815(c)(3). On cross-motions for summary judgment and PB–KBB's motion, in the alternative, to dismiss for lack of jurisdiction, the ALJ found that PB–KBB's Houston office was a "mine," that Paul was a "miner," and that Paul therefore had standing to bring the action. Accordingly, the ALJ denied the motions and set the case for further proceedings.

Before further proceedings could be had, however, the Commission granted PB–KBB's petition for interlocutory review and reversed the ALJ. A majority of the three member panel found that the work of producing a preliminary engineering design did not constitute mining activity. Because no mine was in existence at the time of Paul's discharge, the majority reasoned, Paul was not a miner and the Mine Act provided him with no job protection. The third panel member concurred on the ground that the ESFs, "would not, when and if brought to fruition, be subject to the Mine Act." Accordingly, on November 21, 1985, the Commission dismissed Paul's complaint for lack of jurisdiction.

## II.

The gist of Paul's complaint is that he was fired for "blowing the whistle" on PB–KBB. Assuming his allegations to be true, as we must on review of an order of dismissal, the question becomes whether Paul is covered by the employee protective provisions of § 105(c)(1) of the Act. Section 105(c)(1) states that "No person shall discharge ... any miner [or] representative of miners ... because such miner [or] representative of miners ... has filed or made a complaint under or related to this chapter." 30 U.S.C. § 815(c)(1).[1] Paul main-

---

**1.** Section 105(c)(1) provides in its entirety:

No person shall discharge or in any manner discriminate against or cause to be discharged

tains that, under this section, he was a "miner [or] representative of miners" who could not be discharged for initiating a Mine Act complaint. To assess this argument, we begin by consulting the statutory definitions.

Section 3(g) of the Act defines "miner" as "any individual working in a coal or other mine." 30 U.S.C. § 802(g). Thus, to be a miner one must work in a mine; *a fortiori*, a "representative" of miners must act on behalf of individuals who work in a mine.[2] The next section of the Act, § 3(h)(1), defines "coal or other mine" in pertinent part as follows:

"coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form ..., (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property ... on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form ... or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals....

30 U.S.C. § 802(h)(1).

In Paul's view, both the Houston office of PB–KBB and the prospective ESF sites qualify as mines under the above definition. Conceding that PB–KBB engages in no more than preliminary design activities at its Houston office, Paul urges us to read the definition expansively to include these activities. Paul would also have us interpret the phrase "to be used in" as broad enough to encompass the ESFs, even though no ESFs exist at this time.

Paul correctly points out that we have previously construed "mine" expansively, consistent with the purposes of the Mine Act. In *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547 (D.C.Cir.1984), this court held that Stalite, a slate gravel processing facility located adjacent to a quarry, was a mine subject to the Act. Though the slate was extracted not by Stalite but by the quarry, which was an independent business operation, the court found that the Act was not restricted to companies that actually engaged in mineral extraction. Since as a matter of "industrial and economic reality" the two facilities formed "a unified mineral processing operation," the court concluded that the Act covered Stalite's processing activities. *Id.* at 1551.

The *Stalite* court noted that the legislative history of the Mine Act supported an expansive reading of "mine" and that previous cases from other circuits had found post-extraction mineral preparation activities to fall within the Act's ambit. *Id.* at 1553–54; *see Harman Mining Corp. v. Federal Mine Safety & Health Review Comm'n*, 671 F.2d 794 (4th Cir.1981) (loading of coal that already had been extracted and prepared took place at a "mine"); *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589 (3d Cir.1979) (operation that purchased and prepared minerals dredged

---

or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title or because such miner, representative of miners or applicant for employment has instituted or

caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.

30 U.S.C. § 815(c)(1).

**2.** "Representative of miners" is defined in the regulations as:

(1) Any person or organization which represents two or more miners at a coal or other mine for the purposes of the Act, and

(2) "Representatives authorized by the miners," "miners or their representative," "authorized miner representative," and other similar terms as they appear in the Act.

30 C.F.R. § 40.1(b).

from riverbed by state was a "mine") *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); S.Rep. No. 181, 95th Cong., 1st Sess. 14, *reprinted in* 1977 U.S. Code & Admin.News 3401, 3414 ("[I]t is the Committee's intention that what is considered to be a mine and to be regulated under the Act be given the broadest possible interpretation.").

■ None of these cases, however, and nothing in the legislative history supports the application of the Act to the facts of this case. Whether we focus on the Houston office or the prospective ESF sites, the simple facts remain that no mineral has been extracted from the ground, no construction work has taken place, indeed, no final site selection has been made in connection with the ESF project. Unlike the post-extraction activities considered in *Stalite* and its predecessors, PB–KBB's work is wholly conceptual in nature, preceding the very existence of a mine location. For all we know ground may never be broken on the ESF project.

Paul puts great emphasis on the prospective language of § 3(h)(1), arguing that the ESF sites are mines because they consist of "lands ... to be used in" the work of mineral extraction. Likewise, in Paul's view, the Houston office is a mine because it is a "facility" at which PB–KBB uses "equipment, machines, tools, or other property ... to be used in" the work of mineral extraction. This construction, accepted by the ALJ, stretches the language of the Act beyond its breaking point. Reading § 3(h)(1) in context with the rest of the Act, we think the more reasonable interpretation is that § 3(h)(1) is not applicable prior to the commencement of any mineral extraction or construction activities. The phrase "to be used in" merely refers to property that has not yet, but will be, committed to the work of extraction at a *preexisting* site or structure.[3]

■ We need not decide whether the ESFs, once constructed or in the process of construction, would be a mine. We rest our decision on a more fundamental ground. Preliminary engineering and design activities are not covered by the Mine Act. Paul contends that this interpretation will frustrate the purposes of the Act, but we disagree. Conceptual designs do not endanger lives or property; any hazards they pose, prior at least to their final approval or the initial stages of their implementation, are purely hypothetical. The Act was not designed to regulate *ideas.* To classify the Houston offices of PB–KBB or the planned ESF sites as a "mine" would, in our view, exceed the limits of the "broadest possible interpretation" of § 3(h)(1). S.Rep. No. 181, *supra,* at 14, 1977 U.S.Code Cong. & Admin.News at 3414.

Paul raises two final arguments. First, he maintains that even if he is not a miner or representative of miners he is entitled to proceed under § 105(c)(1). In Paul's view, § 105(c)(1) protects from retaliatory discharge any "person" who files a Mine Act complaint. In support, Paul relies on *Donovan v. Stafford Construction Co.,* 732 F.2d 954 (D.C.Cir.1984), in which this court found that Anderson, a bookkeeper-secretary, was protected by § 105(c)(1). The distinction Paul fails to mention is that Anderson worked at a mine. Though she was not directly involved in the work of extraction, we found that the ALJ correctly treated her as a "miner." Paul, by contrast, is not a miner nor a representative of miners, for reasons we have explained.[4]

*Stafford* contains some additional language which may be read to support Paul's view, however. Anderson was fired for refusing, upon request by her employer, to tell Mine Safety and Health Administration investigators that her co-worker had been fired not for filing a safety-related complaint, but as part of a general reduction in

---

3. This interpretation finds indirect support in the jurisdictional provision of the Act, 30 U.S.C. § 803, which extends the Act's coverage to mines "the products of which enter commerce [or] ... affect commerce" but says nothing about prospective effects upon commerce.

4. There is a third class of individuals protected by § 105(c)(1), but Paul is obviously not an "applicant for employment." 30 U.S.C. § 815(c)(1).

force. The court, having found that Anderson was a miner, went on to state:

> Furthermore, even if Anderson did not qualify as a "miner" within the meaning of the Act, she would be protected against retaliation for providing testimony in federal mine safety proceedings involving the Company. *Cf.* I *The Developing Labor Law* 262 (C. Morris ed., 2d ed. 1983) (noting that the NLRB has held that even employees who are otherwise not covered under National Labor Relations Act are protected against retaliation for filing charges or giving testimony in Board proceedings).

*Id.* at 958. The meaning of this passage is not entirely clear. The *Stafford* court may simply have assumed that one who testifies in mine safety proceedings would perforce be, if not a miner, a representative of miners. Anderson, for example, by declining to give false testimony, was clearly advancing the miners' interest in a safe working environment. Alternatively, the court may have been saying that some persons are protected under § 105(c)(1) for assisting in Mine Act enforcement activities even though they are neither miners nor representatives of miners. In any event, we do not think the *Stafford* court intended to extend § 105(c)(1) protections to non-miners and non-representatives of miners prior to the commencement of any mining activity.

Finally, Paul appears to argue that he is entitled to proceed under § 105 since PB–KBB is a mine "operator" within the meaning of § 3(d) of the Act. This argument takes us through the same thicket from which we have already emerged, however. The definition of "operator," like that of "miner," presupposes the existence of a "mine." *See* 30 U.S.C. § 802(d).

### CONCLUSION

Since neither the offices of PB–KBB nor the prospective ESF sites are a "mine," Paul cannot be a "miner" as defined in § 3(g) of the Mine Act nor a "representative of miners." Further, Paul is not protected as a Mine Act complainant prior to the existence of a mine or the selection of a mine site. As such, Paul has no cause of action under § 105(c)(1) and the Commission correctly found itself lacking in jurisdiction. Accordingly, the Commission's order dismissing Paul's complaint is

*Affirmed.*