772 F.2d 92
 12 O.S.H. Cas.(BNA) 1460, 1984-1985 O.S.H.D. ( 27,377
 OLD DOMINION POWER COMPANY, Petitioner,
v.
Raymond DONOVAN, Secretary of Labor and the Federal Mine
Safety and Health Administration and the Federal
Mine Safety and Health Review
Commission, Respondents.
Edison Electric Institute, Amicus Curiae.
 No. 84-1942.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1985.
Decided Sept. 18, 1985.
 
 Walter L. Sales, Louisville, Ky. (Thomas V. Kennedy, Ogden, Robertson & Marshall, Louisville, Ky., on brief), for petitioner.
 Stephen C. Yohay (Douglas S. McDowell; McGuiness & Williams, Washington, D.C., on brief), for amicus curiae.
 Vicki J. Shteir-Dunn (Francis X. Lilly, Sol. of Labor, Cynthia L. Attwood, Associate Sol., Michael A. McCord, Appellate Litigation, Washington, D.C., on brief), for respondents.
 Before HALL and CHAPMAN, Circuit Judges, and KNAPP, Senior United States District Judge, Southern District of West Virginia, sitting by designation.
 K.K. HALL, Circuit Judge:
 
 
 1
 Old Dominion Power Company ("Old Dominion") petitions this Court to review and set aside the final decision of the Federal Mine Safety and Health Review Commission (the "Commission"), holding: (1) that Old Dominion was an independent contractor and an "operator" within the meaning of the Federal Coal Mine Safety and Health Act of 1977, 30 U.S.C. Secs. 801 et seq. (the "Mine Act"); (2) that Old Dominion breached Mine Safety and Health Administration ("MSHA") regulations when one of its employees was electrocuted on mine property; (3) that the issuance of a citation to Old Dominion one year after the incident was reasonably prompt; and (4) that a civil penalty of $1,000 was appropriate.[1] We reverse.
 
 I.
 
 2
 On January 22, 1980, James Harlow was electrocuted at an electrical substation near a coal mine in southwestern Virginia. Harlow was employed by Old Dominion, an electric utility serving southwestern Virginia.
 
 
 3
 Westmoreland Coal Company ("Westmoreland") leases the property where the fatality occurred, and has contracted with Elro Coal Corporation ("Elro") to operate the mine on the property. The substation is located on the property adjacent to a mine-access road and is segregated by a locked, chain link fence. Westmoreland built and owns the substation. It is composed of transformers, meters, power lines, and utility poles. Westmoreland purchases high-voltage power from Old Dominion and transmits it to the substation, which reduces the voltage to a lower voltage suitable for use by Elro in its mining operations. The only facilities owned by Old Dominion at the substation are those needed by the utility to determine how much electricity Westmoreland has purchased.
 
 
 4
 The sole revenue derived by Old Dominion from its relationship with Westmoreland is for the sale of electric power. Old Dominion does not perform any maintenance at the substation, or of the transmission or distribution lines leading to and from the substation. Old Dominion's employees install equipment to measure voltage and amperage for its meter, maintain the meter, and read it approximately once per month for purposes of billing.
 
 
 5
 On the afternoon of January 21, 1980, Westmoreland's electrical foreman energized the substation for the first time. The following morning he notified the superintendent of metering for Old Dominion that in his opinion the meter was not working properly. As a result of that conversation, Harlow and another electrical worker employed by Old Dominion drove to the substation. It was raining and foggy, and visibility was poor. They knew that the substation had been energized on the previous day. Nevertheless, Harlow concluded that it was de-energized, and his co-worker believed him. Harlow climbed the pole and was electrocuted when he touched the energized transformer.
 
 
 6
 MSHA was immediately notified of the fatality and investigated the accident. The Occupational Safety and Health Administration ("OSHA") also investigated the fatality but issued no citations. MSHA found that Old Dominion's employees violated 30 C.F.R. Sec. 77.704, a mandatory safety standard promulgated under the Mine Act, by working on high-voltage lines without de-energizing and grounding them.[2]
 
 
 7
 Questions then arose as to which party MSHA should cite.[3] Initially, MSHA cited Elro. Later, on April 3, 1980, MSHA reissued the citation to Westmoreland. Finally, on January 19, 1981, nearly one year after the accident, the citation was modified to name Old Dominion as the operator instead of Westmoreland.
 
 
 8
 Old Dominion contested the citation, asserting that: (1) it was neither an "operator" nor an "independent contractor" as defined by the Mine Act; (2) it was not subject to the Mine Act; (3) the changes in policy and rules which designated Old Dominion as an "operator" or "independent contractor" were not authorized by the statute, were not properly adopted, and were not constitutional; and (4) the citation was not timely issued.
 
 
 9
 A hearing was then held before an administrative law judge ("ALJ") on April 22, 1981. The ALJ rejected each of Old Dominion's arguments and, finding that Old Dominion had been negligent in this case, ordered it to pay a $3,000 civil penalty.
 
 
 10
 Thereafter, the Commission granted Old Dominion's petition for review. On August 29, 1984, a majority of the Commission affirmed the ALJ's decision on all points, except it reduced the civil penalty from $3,000 to $1,000. The Commission ruled that the electrical substation is part of the coal mine within the Mine Act definition of a "mine." Noting that there was no dispute that mandatory safety standard 30 C.F.R. Sec. 77.704 had been violated, the Commission concluded that Old Dominion is an independent contractor performing services, within the meaning of Sec. 3(d) of the Mine Act, 30 U.S.C. Sec. 802(d). Rejecting Old Dominion's argument that OSHA, and not MSHA, has regulatory authority over the substation, the Commission held that the Secretary has the discretion to determine, as he did here, that the Mine Act applies rather than the Occupational Safety and Health Act (the "OSH Act"). The Commission likewise determined that the Secretary's regulation defining "independent contractor" was not applied in an arbitrary and capricious manner. Moreover, it concluded that the Secretary had satisfied the statutory requirement that a citation be issued with "reasonable promptness." Finally, the Commission held that the record did not support the ALJ's decision that Old Dominion was negligent and reduced the penalty to $1,000.
 
 
 11
 Chairperson Collyer dissented, finding that Old Dominion was merely a vendor of electricity and not an "operator" under the Mine Act. She argued that Old Dominion was not "providing services" to Westmoreland or Elro at the substation as required under Sec. 3(d) of the Mine Act so as to transform the utility into an "operator." In Chairperson Collyer's view, Old Dominion installed its meter not to "provide services" to the mine, but solely to measure the quantity of electricity that it, as a vendor, sold to the mine. She noted that the utility would not be involved in repair and restoration of power at the substation after an industrial accident or weather damage unless there were a problem involving the metering equipment. Relying on the legislative history of the Mine Act, Chairperson Collyer asserted that Congress intended that the only contractors who could be held liable were those having some "continuing presence" at a mine site. She criticized the majority for providing no basis for distinguishing the utility from other vendors, such as the Coca Cola man who comes onto mine property to refill the Coke machine in the office and the Xerox service representative who comes onto mine property to install, maintain, repair and replace copier equipment in the mine office used for mine plans, shift assignments, and the like.
 
 
 12
 Old Dominion petitions for review.
 
 II.
 
 13
 On appeal, Old Dominion contends that OSHA, rather than MSHA, is the appropriate agency to regulate electric utility employees who are not intimately involved in the mine construction or extraction process. Petitioner argues that the legislative history of the Mine Act demonstrates that electric utilities were not considered as "operators" and the Mine Act was not intended to apply to the "working conditions" of electric utility employees. The utility further contends that MSHA's regulations defining "operator" are arbitrary, ignore the clear meaning of the statute and are not entitled to usual judicial deference. According to petitioner, MSHA's standards are not applicable to electric utilities and could not have been adopted with electric utilities in mind. It argues that MSHA's final rule on independent contractors cannot be applied to electric utilities because the rule gives no notice of its applicability to electric utilities and contains no guidelines for identifying independent contractors as "operators." Finally, Old Dominion contends that the one-year delay by MSHA in issuing the citation does not constitute "reasonable promptness" as required by the Mine Act.[4]
 
 
 14
 Except for Old Dominion's last contention, we agree with each of its arguments.[5] Our conclusion is supported by the statutory language, legislative history, and case law.
 
 
 15
 The OSH Act provides for the enforcement of mandatory health and safety standards for the protection of all workers across the country. Its coverage of all businesses affecting interstate commerce is subject to a limited exception contained in Sec. 4(b)(1) of the OSH Act, 29 U.S.C. Sec. 653(b)(1). That statute provides in relevant part that: "Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies, and State agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." (Emphasis added).
 
 
 16
 In Southern Railway Co. v. Occupational Saf. & H. Review Comm., 539 F.2d 335 (4th Cir.), cert. denied, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976), we interpreted the term "working conditions" as used in the statute to mean "the environmental area in which an employee customarily goes about his daily tasks." Id. at 339. We further stated that "when an agency has exercised its statutory authority to prescribe standards affecting occupational safety or health for such an area, the authority of the Secretary of Labor in that area is foreclosed." Id. (footnote omitted).
 
 
 17
 Applying this definition of "working conditions" to the facts of this case, we conclude that Old Dominion is properly regulated by OSHA, and not MSHA. Old Dominion's only contact with the mine is the inspection, maintenance, and monthly reading of a meter for the purpose of sending a bill to a mine company for the sale of electricity. Petitioner's employees rarely go upon mine property and hardly, if ever, come into contact with the hazards of mining. They perform no activities or functions on mine property which they do not perform elsewhere. MSHA seeks to regulate those few moments every month when electric utility workers read or maintain meters on mine property. Old Dominion's employees are otherwise totally regulated by OSHA. We conclude that OSHA's jurisdiction over electric utilities has not been preempted by MSHA.
 
 
 18
 The legislative history of Sec. 3(d) of the Mine Act, 30 U.S.C. Sec. 802(d), supports our conclusion and demonstrates that Congress intended to include within the Mine Act's definition of "operator" only those independent contractors who are involved in mine construction or extraction and who have a "continuing presence" at the mine. Originally, the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. Secs. 801 et seq., (the "Coal Act") defined "operator" as "any owner, lessee, or other person who operates, controls or supervises a coal mine." Coal Act, Pub.L. No. 91-173, Sec. 3(d), 83 Stat. 742, 743 (current version at 30 U.S.C. Sec. 802(d)). This Court applied that definition to independent contractors in Bituminous Coal Operators Ass'n v. Secretary of Interior, 547 F.2d 240 (4th Cir.1977). We held that construction companies employed by mining companies as independent contractors could be held liable as "operators" because "construction employees share the risks to which miners are exposed." Id. at 245. Thereafter, in 1977, Congress amended the definition of "operator" to mean "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." 30 U.S.C. Sec. 802(d) (emphasis added).
 
 
 19
 The Joint Explanatory Statement of the Conference Committee explains this amendment as follows:
 
 
 20
 The Senate bill modified the definition of "operator" to include independent contractors performing services or construction at a mine. This was intended to permit enforcement of the Act against such independent contractors, and to permit the assessment of penalties, the issuance of withdrawal orders, and the imposition of civil and criminal sanctions against such contractors who may have a continuing presence at the mine. The House amendment had no comparable provision.
 
 
 21
 The conference substitute conforms to the Senate bill.
 
 
 22
 S.Rep. No. 95-461, 95th Cong., 1st Sess. 37 (1977) (emphasis added).
 
 
 23
 The Senate Human Resources Committee Report accompanying the 1977 amendments, states that:
 
 
 24
 [T]he definition of mine "operator" is expanded to include "any independent contractor performing services of construction at such mine." It is the Committee's intent to thereby include individuals or firms who are engaged in construction at such mine, or who may be, under contract or otherwise, engaged in the extraction process for the benefit of the owner or lessee of the property and to make clear that the employees of such individuals or firms are miners within the definition of the Federal Mine Safety and Health Act of 1977. In enforcing this Act, the Secretary should be able to issue citations, notices, and orders, and the Commission should be able to assess civil penalties against such independent contractors as well as against the owner, operator, or lessee of the mine. The Committee notes that this concept has been approved by the federal circuit court in Bituminous Coal Operators' Assn. v. Secretary of the Interior, 547 F.2d 240 (C.A.4, 1977).
 
 
 25
 S.Rep. No. 95-181, 95th Cong., 1st Sess. 14, reprinted in 1977 U.S.Code Cong. & Ad.News 3401, 3414.
 
 
 26
 These key passages of legislative history make clear Congress' intent to define as "operators" only those independent contractors who are engaged in mine construction or the extraction process, and who have a "continuing presence" at the mine. Old Dominion, whose contacts are rare and remote from the mine construction or extraction process, does not meet this definition of "operator."
 
 
 27
 Moreover, the Third Circuit has construed the new definition of "operator" and concluded that not all independent contractors working at a mine site are to be regarded as operators. As that court explained:
 
 
 28
 The reference made in the statute only to independent contractors who "perform[ ] services or construction" may be understood as indicating, however, that not all independent contractors are to be considered operators. There may be a point, at least, at which an independent contractor's contact with a mine is so infrequent or de minimis that it would be difficult to conclude that services were being performed. Such a reading of the statute is given color by the fact that other persons deemed operators must "operate[ ], control[ ], or supervise[ ]" a mine. Designation of such other persons as operators thus requires substantial participation in the running of the mine; the statutory text may be taken to suggest that a similar degree of involvement in mining activities is required of independent contractors before they are designated as operators.
 
 
 29
 National Industrial Sand Ass'n. v. Marshall, 601 F.2d 689, 701 (3d Cir.1979) (emphasis added) (footnote omitted). We agree with this analysis and adopt it.
 
 
 30
 Plainly, Congress intended to exclude electric utilities, such as Old Dominion, whose only presence on the site is to read the meter once a month and to provide occasional equipment servicing. MSHA's final regulation defining "independent contractor" as "any person, partnership, corporation, subsidiary of a corporation, firm, association or other organization that contracts to perform services or construction at a mine" is not controlling. 30 C.F.R. Sec. 45.2(c) (1984). Moreover, because MSHA's position contradicts its earlier interpretation of Sec. 3(d) as expressed in its proposed regulations, it is not entitled to the deference usually given by this Court to agency interpretations of the statutes they are commissioned to enforce. General Electric Co. v. Gilbert, 429 U.S. 125, 140-45, 97 S.Ct. 401, 410-13, 50 L.Ed.2d 343 (1976).[6]III.
 
 
 31
 Old Dominion also contends that MSHA's standards are not applicable to electric utilities, and could not have been adopted with electric utilities in mind. We agree.
 
 
 32
 MSHA and OSHA have adopted inconsistent regulations regarding electric utilities. For example, MSHA requires at least a ten-foot clearance between an energized overhead power line and the booms and masts of equipment operated on the surface of a coal mine, 30 C.F.R. Sec. 77.807-2. OSHA, on the other hand, permits electric utility employees and equipment to move much closer than ten feet from overhead lines, 20 C.F.R. Secs. 1926.950(d) (Table V-1); . 952(c)(2).[7] Requiring electric utility employees suddenly to adhere to conflicting standards depending on their job location can only lead to danger, especially where work around high voltage is involved. As explained by the Occupational Safety and Health Commission:
 
 
 33
 "Rules are more likely to be observed if their rationale is understood and it is made clear that they are not just arbitrary pronouncements but are grounded in practical reasons for safety." Employees who are told they must stay ten feet away from energized power lines if the power lines are in one geographic location but may come as close as two feet away from energized power lines if the lines are in another location, even though the latter lines are potentially just as lethal as the former, might well question the logic behind such instructions. Such questioning on the part of employees could lead to a failure to take such matters seriously and a failure to exhibit the caution necessary to prevent accidents.
 
 
 34
 New England Telephone and Telegraph Co., 8 BNA OSHC 1478, 1490 (1980) (quoting Brennan v. Butler Lime and Cement Co., 520 F.2d 1011, 1018 (7th Cir.1975)).
 
 
 35
 In addition, other MSHA standards, when applied to electric utilities, lead to irrational results. For example, MSHA's regulation at 30 C.F.R. Sec. 77.516 provides that all wiring and electrical equipment installed after June 30, 1971, must comply with the National Electrical Code (the "NEC") in effect at the time of installation. The NEC, however, expressly excludes electric utilities. NEC Art. 90.2(b)(5) (1981 ed.). Thus, MSHA would apply to electric utilities a code which by its very terms excludes electric utilities.
 
 
 36
 OSHA has adopted strict and comprehensive safety standards which include standards specifically designed to apply to electric utilities. MSHA has adopted contradictory regulations. The Secretary of Labor has not articulated any reasons why the standards applicable to electric utilities under OSHA should be different from standards which he says are applicable to electric utilities under MSHA. We conclude that MSHA regulations do not apply, and were not intended to apply, to electric utilities such as Old Dominion whose sole relationship to the mine is the sale of electricity.
 
 IV.
 
 37
 For the foregoing reasons, the Commission's decision is reversed.
 
 REVERSED
 
 
 [1]
 Edison Electric Institute, a national association of investor-owned utility companies in the United States, has filed an amicus curiae brief in support of Old Dominion
 
 
 [2]
 30 C.F.R. Sec. 77.704 reads as follows:
 High-voltage lines shall be deenergized and grounded before work is performed on them, except that repairs may be permitted on energized high-voltage lines if (a) such repairs are made by a qualified person in accordance with procedures and safeguards set forth in Secs. 77.704-1 through 77.704-11 of this Subpart H as applicable, and (b) the operator has tested and properly maintained the protective devices necessary in making such repairs.
 
 
 [3]
 MSHA's regulations on identifying independent contractors as "operators" under Sec. 3(d) of the Mine Act, 30 U.S.C. Sec. 802(d), did not exist when the accident in this case occurred. MSHA had issued a proposal for establishing criteria to identify independent contractors as "operators" in August, 1979. The accident here occurred on January 22, 1980, before the final rule was issued on July 1, 1980. See infra p. 97 n. 6
 
 
 [4]
 Section 104(a) of the Mine Act, 30 U.S.C. Sec. 814(a), provides in pertinent part that:
 If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator.... The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter.
 
 
 [5]
 Old Dominion's contention that the one-year delay before it was cited violates 30 U.S.C. Sec. 814(a) lacks merit. This argument ignores the last sentence of the statute that: "The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter." Most important, however, Old Dominion has not shown that it was prejudiced by the delay. It knew from the time of its employee's fatal accident that an investigation was being conducted by MSHA. Further, it has been given a full and fair opportunity to participate in all stages of this proceeding
 
 
 [6]
 In the rationale accompanying its proposed regulations on independent contractors, MSHA confirmed that Congress intended to define as operators only those contractors who are engaged in mine construction or extraction and who have a "continuing presence" at a mine. In August, 1979, MSHA published a proposed regulation establishing the criteria to be used in identifying independent contractors as "operators" under Sec. 3(d) of the Mine Act, 30 U.S.C. Sec. 802(d). 44 Fed.Reg. 47,746-53 (1979). In the preamble to the proposed rule, MSHA stressed, in certain terms, that the Mine Act was not intended to include all operators within the definition of "operator." It stated that:
 A large number of the comments received on the draft of the proposed rule stated that MSHA misconstrued congressional intent in proposing to identify only certain independent contractors as operators. Commenters argued that the amended definition of "operator" requires the Secretary to treat all independent contractors performing work at a mine as operators and that the Secretary does not have the authority to identify only certain independent contractors as operators.
 MSHA remains convinced that the Act permits the Secretary to exercise flexibility in enforcing the Act against operators and independent contractors performing work at a mine. This flexibility is well supported in the legislative history and court decisions discussed below.
 Id. (emphasis added). Citing the Third Circuit's decision in National Industrial Sand Ass'n., MSHA explained that the language of the legislative history "was carefully chosen to reflect that the Secretary has flexibility in enforcement of the Act against independent contractors and that the Secretary is not required by the amended definition of 'operator' to cite all independent contractors performing work at mines under all circumstances." Id at 47,747. MSHA further stated that the definition of "operator" requires "substantial participation in the running of the mine," and that a "similar degree of involvement in mining activities is required of independent contractors before they are designated as operators." Id. at 47,748.
 With these basic principles established, MSHA summarized the proposed criteria as follows:
 [T]he proposed rule provides for identification of a contractor as an operator when the contractor (1) is independent of the operator and (2) has control over an area of a mine. The proposed rule further provides that in determining whether a contractor has control over an area of a mine, the Secretary shall consider whether the contractor will be engaged in "major work" and whether the contractor will have a "continuing presence" during the performance of such work.
 Id. The proposed rule defined "major work" as work which is "substantial" in nature, including "(i) Extraction or production activities, mine construction or reconstruction work such as building or rebuilding mills, cleaning plants, shafts, slopes, mining equipment or other mine facilities, and additions to present mine facilities, (ii) Demolition work or similar activities, [and] (iii) Clearing, excavation or reclamation work...." Id. at 47,752. "Continuing presence" was defined to mean "the regular performance of work at a mine for a period of three months or more." Id.
 With respect to the "major work" requirement, MSHA stated that:
 The draft definition of "major work", includes, among other activities, extraction and production, construction of cleaning plants and sinking of shafts and slopes. MSHA believes that independent contractors undertaking such activities would have effective control over an area of the mine during the performance of their work. In contrast, however, it is improbable that independent contractors performing most repair or general maintenance work would have effective control over an area of a mine. Therefore, the size and scope of the project undertaken by an independent contractor at a mine is relevant in determining whether the contractor has control over an area of the mine. The relevance of "major work" is also supported in the legislative history. The Senate Committee Report states that by including in the definition of "operator" independent contractors performing services or construction at a mine, the Committee intended to include individuals or firms "engaged in construction" at a mine or "engaged in the extraction process."
 Id. at 47,747-48 (emphasis added) (citation omitted).
 MSHA also made clear that its proposal to give significance to an independent contractor's "continuing presence" at a mine was based squarely on the agency's reading of the legislative history:
 An independent contractor's regular, essentially uninterrupted presence at a mine while performing work is related to the contractor's ability to effectively control an area of the mine. Moreover, Congress [sic] intention that the Act be enforced against independent contractors that have a continuing presence at a mine is explicitly stated in the legislative history. The Conference Report provides that inclusion of independent contractors in the definition of operator was intended to permit enforcement of the Act against independent contractors "who may have a continuing presence at the mine."
 Id at 47,748 (emphasis added) (citation omitted). MSHA then concluded that
 [t]he draft definitions of "major work" and "continuing presence" incorporate the circumstances under which Congress contemplated that independent contractors would be treated as operators and also describe what MSHA believes are circumstances under which independent contractors performing work at a mine will have effective control over an area of a mine.
 Id. (emphasis added).
 MSHA promulgated its final regulation setting forth the criteria for identifying independent contractors as "operators" in July, 1980. In the final rule, MSHA noted that commentators on the proposal had again objected to the suggested "major work" and "continuing presence" criteria. 45 Fed.Reg. 44,495 (1980). MSHA conceded that it did not have much experience in the field and concluded that ad hoc determinations would be more suitable. Id. Although MSHA retreated from its proposed criteria in the final rule, it nowhere stated in the preamble to the rule that its earlier construction of the legislative history and case law had been wrong. The unequivocal explication of the history accompanying the proposed rule thus remains MSHA's principal pronouncement on the history of Sec. 3(d), and further confirms our conclusion that Congress intended to define as "operators" only those independent contractors who are engaged in mine construction or extraction and who have a "continuing presence" at a mine.
 
 
 [7]
 Additional examples include the following:
 Clearance distances and employee personal protective equipment
 MSHA--requires employees working on energized, high-voltage lines to wear rubber gloves, rubber sleeves and climbing guards from the time the employee leaves the ground until the time he returns to the ground. 30 C.F.R. Sec. 77.704-6.
 OSHA--allows employees to bring their bodies to a point 2 feet from lines or equipment energized at up to 15 kv (and progressively greater distances for higher voltages), before employees are required to protect against electrical contact as by wearing rubber gloves, 29 C.F.R. Sec. 1926.950(c) (Table V-I), and further permits utility workers, using the proper techniques, to perform live-line bare-hand work in the proper circumstances, 29 C.F.R. Sec. 1926.955(e).
 Tagging versus Lockout
 MSHA--for work on electric distribution circuits or equipment, disconnecting devices must be locked out and tagged, unless lockout is impossible. 30 C.F.R. Sec. 77.501.
 OSHA--allows use of a system of tags to assure against accidental re-energization of equipment on which work is being performed. 29 C.F.R. Sec. 1926.950(d).