**OTIS ELEVATOR COMPANY**

v.

**SECRETARY OF LABOR and Federal Mine Safety and Health Review Commission.**

Nos. 89–1712, 89–1713.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1990.

Decided Dec. 18, 1990.

W. Scott Railton, Pittsburgh, Pa., for petitioner in Nos. 89–1712 and 89–1713.

Elizabeth Hopkins, Atty., Dept. of Labor, with whom Allen H. Feldman, Associate Sol., and Steven J. Mandel, Deputy Associate Sol., Dept. of Labor, were on the brief for respondents, in Nos. 89–1712 and 89–1713. Colleen A. Geraghty, Dept. of Labor, and L. Joseph Ferrera, Federal Mine Safety and Health Review Com'n, also entered appearances for respondents.

Before WALD, Chief Judge, and SENTELLE and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge CLARENCE THOMAS.

CLARENCE THOMAS, Circuit Judge:

Otis Elevator Company contracts with mining companies to provide periodic service to elevators that carry the companies' employees into the mines. Section 3(d) of the Federal Mine Safety and Health Act defines a mine "operator" as

> any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine.

30 U.S.C. § 802(d) (1982). The principal question in these consolidated petitions for review is whether Otis is an "operator," and thus subject to regulation under the Mine Act. We conclude that it is.

I.

In 1969, in order to "protect[ ] the health and safety of persons working in the coal mining industry," Congress enacted the Federal Coal Mine Health and Safety Act (Coal Mine Act), Pub.L. No. 91–173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 801–960). The Coal Mine Act subjected

to regulation every coal mine affecting commerce, and every operator of such coal mines. *See id.* § 4, 83 Stat. at 744. Section 3(d) of the Coal Mine Act defined an "operator" as "any owner, lessee, or other person who operates, controls, or supervises a coal mine." *Id.* § 3(d), 83 Stat. at 744. Courts interpreted this provision to encompass independent contractors whenever the contractors, in performing services at a coal mine, controlled or supervised all or part of the mine. *See Association of Bituminous Contractors, Inc. v. Andrus,* 581 F.2d 853, 860–62 (D.C.Cir.1978); *Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d 240, 246 (4th Cir. 1977).

In 1977, Congress amended the Coal Mine Act and renamed it the Federal Mine Safety and Health Act (Mine Act). *See* Pub.L. No. 95–164, 91 Stat. 1290. Congress broadened section 3(d) of the Coal Mine Act to include "any independent contractor performing services or construction at [a] mine." *See id.* § 102(b)(2), 91 Stat. at 1290. The legislative history of this extension is scant. In pertinent part, the report of the Senate Human Resources Committee explained that the definition of an operator was "expanded" in order to "include individuals or firms who are ... engaged in the extraction process." S.Rep. No. 181, 95th Cong., 1st Sess. 14 [hereinafter Senate Report], *reprinted in* 1977 U.S.Code Cong. & Admin. News 3401, 3414. The Conference Committee Report stated that the expanded definition "was intended to permit enforcement of the Act against such independent contractors ... who may have a continuing presence at the mine." H. Conf. Rep. No. 655, 95th Cong., 1st Sess. 37 [hereinafter Conference Committee Report], *reprinted in* 1977 U.S.Code Cong. & Admin.News 3485, 3485.

Section 508 of the Mine Act authorizes the Secretary of Labor to "issue such regulations as [she] deems appropriate" to carry out the Mine Act. 30 U.S.C. § 957. The Secretary does so through the Mine Safety and Health Administration (MSHA), an agency within the Department of Labor. *See* 29 U.S.C. § 557a. Pursuant to section 508, MSHA has construed the Mine Act as

extending to "*any* person [who] contracts to perform services or construction at a mine." 30 C.F.R. § 45.2(c) (1990) (emphasis added).

The Mine Act also delegates enforcement responsibility to the Secretary. When an MSHA inspector discovers that an operator has violated a Mine Act regulation, the inspector issues a citation. *See* 30 U.S.C. § 814. The operator is entitled to contest the citation before the Federal Mine Safety and Health Review Commission (FMSHRC or the Commission). A contest proceeding is adjudicated before an administrative law judge (ALJ) and is subject to discretionary review before the Commission itself. *See id.* § 823(d)(1), (d)(2)(A)(i).

The Secretary of Labor also regulates workplace safety under the Occupational Safety and Health Act (OSH Act), 29 U.S.C. §§ 651–678. The OSH Act, however, does not extend to "working conditions of employees with respect to which other Federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." *Id.* § 653(b)(1). Thus, with regard to health and safety in the workplace, the Secretary regulates an employer falling within the Mine Act definition of an operator under that Act, while she regulates an employer not so classified under the OSH Act.

## II.

Otis contracts to provide periodic maintenance and repairs to elevators owned and operated by others. Usually, Otis services above-ground building elevators, during which time it is subject to regulation under the OSH Act. This case, however, arises out of services Otis performed on underground elevators that carry miners into the respective mines of two companies, the Pennsylvania Mines Corporation and the BethEnergy Corporation. Otis mechanics worked at each mine for less than 20 hours per month, and control of the serviced elevators remained with the mining company at all times.

On February 27, 1986, Otis mechanics installed a steel governor rope in a Pennsylvania Mines Corp. mine elevator. A governor rope activates a safety device that stops an elevator when the passenger car exceeds a certain speed. On March 3, 1986, an MSHA inspector determined that the rope had been attached improperly. He therefore cited Otis for violating Mine Act regulations.

On October 27, 1986, Otis mechanics serviced a BethEnergy mine elevator. An MSHA inspector determined that Otis's mechanics were neither qualified under Mine Act regulations to perform electrical work nor supervised by someone who was so qualified. The inspector also determined that although the mechanics had properly shut off and padlocked the main power switch, they had failed to tag the switch, as required by Mine Act regulations. The inspector issued two citations for these violations.

Otis contested the citations, challenging not only their merits but also the authority of the Secretary to regulate Otis under the Mine Act. In each case, an ALJ concluded that Otis was an "operator" subject to Mine Act regulation and affirmed the citation or citations on the merits. *See Otis Elevator Co.,* 9 F.M.S.H.R.C. 2038 (1987); *Otis Elevator Co.,* 9 F.M.S.H.R.C. 1933 (1987). The Commission granted review in both cases and affirmed the ALJs' decisions. It reasoned that Otis was a mine operator because the services it provided were "sufficiently related to the overall [coal] extraction process," *Otis Elevator Co.,* 11 F.M.S.H.R.C. 1896, 1902 (1989), and because Otis's presence in the mines was neither "rare" nor "infrequent," *Otis Elevator Co.,* 11 F.M.S.H.R.C. 1918, 1923 (1989). Otis petitions for review of the Commission's decisions. We have jurisdiction under 30 U.S.C. § 816(a)(1).

### III.

We first determine whether Otis is an "operator" under section 3(d) of the Mine Act.

### A.

■ At the outset, we confront the difficult question of our appropriate standard of review. Under the familiar rule of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must uphold an agency's reasonable construction of a statute it is entrusted to administer, even if we would have imposed a different construction in the first instance. *See id.* at 842–45 & n. 11, 104 S.Ct. at 2781–83 & n. 11. In this case, the Commission concluded that "not all independent contractors [who perform services at mines] are operators under the Mine Act." 11 F.M.S.H.R.C. at 1900. The Secretary disagrees, having promulgated regulations stating that "*any* person [who] contracts to perform services . . . at a mine" is an operator. 30 C.F.R. § 45.2(c) (emphasis added). If deference under *Chevron* were appropriate, we would owe that deference to the Secretary's interpretation, not the Commission's. *See Secretary of Labor v. Cannelton Indus.,* 867 F.2d 1432, 1433 (D.C.Cir.1989).

The question whether *Chevron* applies, however, in the context of an agency's determination of its own statutory jurisdiction is unsettled in this circuit. *See, e.g., Business Roundtable v. SEC,* 905 F.2d 406, 408 (D.C.Cir.1990) (reserving the question); *Public Utils. Comm'n v. FERC,* 900 F.2d 269, 275 n. 5 (D.C.Cir.1990) (same). We see no reason to decide the question in this case. For reasons set out below, we think that the Secretary's reading of section 3(d), as expressed in the Mine Act regulations, is the correct one even assuming that her reading is entitled to no deference.[1]

1. In *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547 (D.C.Cir.1984), we held that the Secretary's determinations regarding what constitutes a "mine" under § 3(h) of the Mine Act, 30 U.S.C. § 802(h), although jurisdictional, are entitled to deference. *See* 734 F.2d at 1551–54. In part, we relied on the fact that the putative mines at issue were unquestionably subject to regulation under either the Mine Act or the OSH Act, so that the Secretary in effect was not determining the outer limits of his own authority, but merely "adjusting the administrative burdens between

## B.

■ Section 3(d) of the Mine Act defines an "operator" as

> any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine.

30 U.S.C. § 802(d). Otis does not dispute that it is an "independent contractor" that "perform[ed] services" at a "mine." Rather, Otis contends that the term "operator" does not encompass "any independent contractor performing services or construction at [a] mine," as the words of the statute provide, but covers only those independent contractors "who operate[ ], control[ ], or supervise[ ] a coal or other mine."

Otis supports its reading of the text by appeal to the canon of *ejusdem generis.* Under that canon, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A N. Singer, *Sutherland Statutory Construction* § 47.17, at 166 (4th ed. 1984) (footnote omitted). Otis reasons that because the clause "who operates, controls, or supervises a coal or other mine" describes or qualifies each noun in the preceding phrase "any owner, lessee, or other person," the clause should also be read as qualifying the succeeding phrase "any independent contractor performing services or construction at such mine."

We find Otis's reliance on *ejusdem generis* misplaced. In proposing that the general term "other person" be read *ejusdem generis* with the following, grammatically independent term "independent contractor," Otis ignores two requirements of the canon—that the general words *follow* the specific words and that the general words be *enumerated* together with the specific words. Reading the general term "other person" *ejusdem generis* with the specific preceding terms "owner" and "lessee" complies with these prerequisites. *See Association of Bituminous Contractors, Inc. v. Andrus,* 581 F.2d 853, 861 (D.C.Cir. 1978). On the other hand, reading the term "other person" *ejusdem generis* with the subsequent, specific, and disjunctively enumerated term "independent contractor" would violate both requirements.

Even worse, Otis's proposed misapplication of *ejusdem generis* would violate another fundamental canon—that "[a] statute should be construed so that effect is given to all its provisions." 2A N. Singer, *supra,* § 46.06, at 104. Since all independent contractors are "person[s]," [2] any independent contractor who operates, controls, or supervises a coal mine is also a "person who operates, controls, or supervises a coal … mine"—and therefore an operator. Thus, by reading the clause "who operates, controls, or supervises a coal … mine" as implicitly modifying the term "any independent contractor," Otis would reduce to surplusage the phrase "any independent contractor performing services … at [a] mine"—the very words Congress added in order to expand the reach of section 3(d). This we decline to do.

Otis relies on *National Industrial Sand Association v. Marshall,* 601 F.2d 689 (3d Cir.1979), in which the Third Circuit upheld proposed regulations that would have exempted certain independent contractors performing services at mines from Mine Act requirements imposed on other statutory operators. At one point, the *National Sand* court tentatively stated that the text of section 3(d) "might be taken to suggest"

---

his various agencies." *Id.* at 1553. Similarly in this case, Otis is unquestionably subject to regulation by the Secretary under one Act or the other. Arguably, therefore, *Carolina Stalite* requires deference to the Secretary's proposed construction of § 3(d) even assuming that *Chevron* were inapplicable to jurisdictional determinations generally. *Carolina Stalite* is not necessarily controlling, however, because that case also rested in part on language in § 3(h), for which there is no analogue in § 3(d), expressly

authorizing the Secretary to define what constitutes a "mine." *See id.* at 1552. As we do with *Chevron* itself, we assume without deciding that *Carolina Stalite* is inapposite.

**2.** Section 3(f) of the Mine Act defines "person" expansively to include "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization." 30 U.S.C. § 802(f).

that some independent contractors who perform services at mines are not statutory operators. *See id.* at 701; *see also id.* at 701 n. 42. For reasons explained above, we disagree. We think that the phrase "any independent contractor performing services ... at [a] mine" means just that—*any* independent contractor performing services at a mine.[3]

*National Sand* rested alternatively on the proposition that section 3(d) "was clearly concerned with the *permissive* scope of the Secretary's authority, not with the *mandatory* imposition of statutory duties on independent contractors." *Id.* at 703. In other words, the Mine Act grants the Secretary discretion not to regulate certain independent contractors who fall *inside* the statutory definition of an operator. This reasoning simply does not address the question we must confront—whether any independent contractors who perform services at mines fall *outside* the statutory definition. Thus, we find Otis's reliance on *National Sand* misplaced.[4]

Otis also argues that we should follow the Fourth Circuit's decision in *Old Dominion Power Co. v. Donovan*, 772 F.2d 92 (4th Cir.1985), which held in part that section 3(d) encompasses "only those independent contractors who are engaged in ... the extraction process, and who have a 'continuing presence' at the mine." *Id.* at 97. The Commission, however, concluded that section 3(d) extends to an independent contractor only if it provides a service sufficiently related to the extraction process and only if it maintains a presence in a mine that is neither rare nor infrequent. In effect, it adopted a diluted version of the *Old Dominion* criteria. Otis urges us to apply the original *Old Dominion* criteria.

The Secretary urges us to follow the plain language of section 3(d) or, in the alternative, to limit *Old Dominion* to its facts, which involved far more attenuated contacts than are present here.[5]

We decline to endorse either the *Old Dominion* criteria or the Commission's diluted version of those criteria. Section 3(d) does not extend only to *certain* "independent contractor[s] performing services ... at [a] mine"; by its terms, it extends to "*any* independent contractor performing services ... at [a] mine." 30 U.S.C. § 802(d) (emphasis added). *Old Dominion* derived its two limiting criteria from two snippets of legislative history which, read together, establish Congress's special concern with contractors who are " 'engaged in the extraction process' " and who " 'have a continuing presence at [a] mine.' " 772 F.2d at 96 (quoting Senate Report at 14, 1977 U.S.Code Cong. & Admin.News at 3414 (emphasis removed), and Conference Committee Report at 37, 1977 U.S.Code Cong. & Admin.News at 3485 (emphasis removed)). As used in the legislative history, however, the quoted phrases are words of inclusion, not exclusion: the definition of an operator was expanded to "include" these independent contractors, Senate Report at 14, 1977 U.S.Code Cong. & Admin. News at 3414, so as to "permit enforcement" of the Mine Act against them, Conference Committee Report at 37, 1977 U.S. Code Cong. & Admin.News at 3485. Nothing in the legislative history expressly states an intent to cover *only* these independent contractors, however. If the legislative history suggests as much, it is only by negative implication, which is hardly the kind of " 'clearly expressed legislative in-

---

3. We need not confront today whether there is any point "at which an independent contractor's contact with a mine is so infrequent or *de minimis* that it would be difficult to conclude that services were being performed." *National Sand,* 601 F.2d at 701. Otis concedes, as it must, that it was "perform[ing] limited but necessary services" at a mine when the citations were issued. *Brief of Petitioner* at 16–17.

4. We therefore have no occasion to determine the scope of the Secretary's authority, either by regulation or as an exercise of enforcement discretion, to exempt certain statutory operators from Mine Act requirements that it imposes on others.

5. *Old Dominion* involved a utility that, during the course of providing electricity to a mine, installed a meter adjacent to the mine, maintained the meter, and read it about once a month for billing purposes. *See* 772 F.2d at 93. Under the restrictive definition it adopted, the Fourth Circuit had no trouble concluding that the utility was not a § 3(d) operator.

tention'" that might permit us to "question the strong presumption that Congress expresse[d] its intent through the language it cho[se]." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (citation omitted); *cf. Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances."'" (citations omitted)).[6]

Finally, Otis advances a policy argument that permitting the Secretary to regulate Otis employees under the Mine Act would create confusion, and thereby decrease safety, because the employees would be subject to Mine Act regulations when servicing mine elevators, and OSH Act regulations when servicing building elevators. The Secretary responds that exempting Otis from Mine Act regulation would create even more confusion, because Otis employees working in mines would be subject to OSH Act regulation, while the operator's employees would be subject to Mine Act regulation, thus creating "duplicative and overlapping jurisdiction at a single site." Brief for the Secretary at 34. This court is ill-equipped to make the kind of expert policy judgment necessary to evaluate the relative merit of these competing accounts. Fortunately, we need not attempt to do so. Congress has written section 3(d) to encompass *"any* independent contractor performing services at a mine" (emphasis added). For present purposes, therefore, we may simply observe that the Secretary's account "is at least not so unthinkable," and Otis's account is at least not so self-evident, "as to compel the conclusion that the [statute] does not mean what it most naturally seems to say." *Pavelic & Leflore v. Marvel Entertainment Group,* — U.S. —, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989).

■ Because Otis contracts to perform services at mines, we conclude that it is an operator subject to regulation under the Mine Act.

### IV.

The MSHA inspector at the Pennsylvania Mines Corporation elevator cited Otis for violating 30 C.F.R. § 75.1725(a), which provides that

> [m]obile and stationary machinery and equipment shall be maintained in safe operating condition and machinery or equipment in unsafe condition shall be removed from service immediately.

In order to give some content to that amorphous command, the Commission has held that equipment is "unsafe" under section 75.1725(a) when "a reasonably prudent person familiar with the factual circumstances surrounding the allegedly hazardous condition, *including any facts peculiar to the mining industry,* would recognize a hazard warranting corrective action." *Alabama By–Products Corp.,* 4 F.M.S.H.R.C. 2128, 2129 (1982) (emphasis added).[7]

■ The inspector concluded that the elevator was rendered unsafe because Otis had failed to attach a governor rope properly to the passenger car. Current regulations do not prescribe specific standards for attaching governor ropes to mine elevators. In issuing the citation, the inspector relied on standards relating to wire ropes promulgated by the American National Standards Institute (ANSI). A previous Mine Act regulation had provided that the ANSI wire rope standards "shall be used *as a guide* in the use ... of wire ropes used for hoisting." 30 C.F.R. § 77.1903(b) (1981) (emphasis added). In *Jim Walter Resources, Inc.,* 3 F.M.S.H.R.C. 2488 (1981), the Commission held that this regulation did not make compliance with the underlying ANSI standards mandatory. In response, MSHA codified several of the

---

6. We do not mean to imply that our reasoning would compel a different result on the facts of *Old Dominion.* The utility in that case never so much as entered the mine. *See supra* note 5. Arguably, therefore, it was not "performing services ... at [a] mine," though of course we need not decide this issue.

7. In the agency proceedings, Otis argued that § 75.1725(a) is unconstitutionally vague as applied to this case. Both the ALJ and the Commission rejected this contention, and Otis does not press it on appeal.

ANSI wire rope standards directly, *see* 48 Fed.Reg. 53,228 (1983), but made the standards inapplicable to wire ropes used in mine elevators, *see* 30 C.F.R. § 75.1430(b) (1990). In light of this background, Otis argues that because the dispositive issue is whether improper attachment of the governor rope rendered the elevator "unsafe" within the meaning of section 75.1725(a), not whether Otis violated ANSI standards regarding attachment of governor ropes, the ALJ erred insofar as he relied on the ANSI standards.

We agree with Otis that the dispositive issue is whether the elevator was rendered unsafe, but we find that the ALJ properly recognized this point and applied the correct legal standard. He stated that "noncompliance with the ANSI standards does not in and of itself establish either a violation of the regulations or a finding that an unsafe condition exists on a piece of machinery or equipment." 9 F.M.S.H.R.C. at 1940. Although the ALJ's reliance on ANSI standards as "a single piece of the equation" is somewhat troubling, he clearly stated that "[t]he ultimate issue in this case is [whether] th[e] terminations render[ed] the governor rope assembly unsafe." *Id.* We are satisfied, as was the Commission, that the ALJ applied the correct legal standard.

■ Otis challenges the ALJ's finding that the attachments of the governor rope rendered the elevator unsafe. In reviewing this essentially factual conclusion, the Commission was obliged to accept the ALJ's finding unless it was "not supported by substantial evidence," 30 U.S.C. § 823(d)(2)(A)(ii)(I), as are we, *see id.* § 816(a)(1). Under that deferential standard of review, we agree with the Commission that the ALJ's finding must be affirmed.

At the administrative hearing, the Secretary introduced expert testimony that because the governor rope was improperly

fastened to the top of the elevator car, it would quickly corrode from exposure to acidic mine water, which could cause the governor rope to fail when needed. Otis's expert testified that the rope, even though fastened in violation of ANSI standards, would function without difficulty. That testimony, however, was based on a study that failed to take account of the possible effect of mine water in corroding the exposed rope termination. Otis's expert thus ignored certain "facts peculiar to the mining industry." *Alabama By–Products Corp.*, 4 F.M.S.H.R.C. at 2129. Under those facts, according to the uncontroverted testimony of the Secretary's expert, Otis's attachment of the governor rope rendered the elevator unsafe. We therefore agree with the Commission that the ALJ's finding is supported by substantial evidence.

## V.

■ The MSHA inspector at the BethEnergy Corporation elevator concluded that Otis employees, by performing electrical work without the supervision of a qualified mine electrician and by failing to tag the power switch they had shut off and locked, twice violated 30 C.F.R. § 77.501.[8] Otis does not dispute that its employees violated this regulation. Instead, Otis contends that unyielding application of section 77.-501 in this case, by requiring its employees to be supervised by mine electricians not specifically trained to service elevators, would decrease the safety of both its employees and the miners. We need not address the merits of this contention, for we conclude that because Otis did not institute a modification proceeding with the Secretary, it was not entitled to raise this argument as a diminution-of-safety defense in the contest proceedings below.

■ Section 101(c) of the Mine Act permits the Secretary, upon petition by an

**8.** In relevant part, that section provides:
No electrical work shall be performed on electric distribution circuits or equipment, except by a qualified person or by a person trained to perform electrical work and to maintain electrical equipment under the direct supervision of a qualified person. Disconnecting devices shall be locked out and suitably tagged by the persons who perform such work.... A "qualified person" is one who meets the requirements of 30 C.F.R. § 77.103. *See id.* § 77.501–1.

operator, to "modify the application of any mandatory safety standard" if she determines that "the application of such standard to [a particular] mine will result in a diminution of safety to the miners." 30 U.S.C. § 811(c). In *Penn Allegh Coal Co.*, 3 F.M.S.H.R.C. 1392 (1981), the Commission held that an operator who fails to seek exemption from a regulation in a modification proceeding cannot escape liability for violating that regulation by raising a diminution-of-safety defense in a subsequent contest proceeding. *See id.* at 1397–99. The Commission reasoned that "questions of diminution of safety [should] first be pursued and resolved in the context of the special procedure provided for in the Act." *Id.* at 1398. Because the Commission's decision does not interpret any arguably jurisdictional provisions and has never been disapproved by the Secretary, we clearly owe it deference under *Chevron. See, e.g., Simpson v. FMSHRC*, 842 F.2d 453, 458–59 (D.C.Cir.1988).

■ At least three different considerations support the Commission's decision. First, section 101(c) expressly provides for consideration of diminution-of-safety concerns in modification proceedings, but nothing in the Act expressly authorizes a diminution-of-safety defense in contest proceedings. Second, modification petitions are determined in the first instance by the *Secretary*, while contest proceedings are determined by the Commission. The power to immunize an operator's disregard for a regulation clearly applicable in a particular case is, in effect, the power to write a new regulation, and the Mine Act clearly vests that power with the Secretary. Third, a modification proceeding can be conducted *before* an operator disregards an assertedly unsafe-as-applied safety regulation, so that if the operator's judgment turns out to have been mistaken, no miners need be put

at increased risk during the time between the initial violation and the judgment rejecting a diminution-of-safety defense in whatever contest proceeding follows. For all of these reasons, we conclude that the Commission's refusal to consider diminution-of-safety concerns in a contest proceeding, unless the operator has given the Secretary prior opportunity to consider those concerns in a modification proceeding, is a reasonable reading of the Mine Act. We therefore endorse *Penn Allegh.*

Otis argues that if operators are required to obtain modification of a regulation before disregarding it, miners could remain exposed to increased safety risks during the time an ultimately meritorious petition for modification remains pending before the Secretary. This concern, however, has almost no force if an operator need only file a petition in order to preserve a diminution-of-safety defense. *Penn Allegh* governs only cases where, as here, the operator does not even file a petition before violating an applicable regulation. Like the Commission, therefore, we need not consider the arguably different case in which the Secretary issues a citation after the operator has filed a modification petition, but before the petition has been finally resolved. *See* 3 F.M.S.H.R.C. at 1399 n. 10.[9]

Because Otis failed to file a petition seeking modification of 30 C.F.R. § 77.501 before choosing to violate that regulation, the ALJ and the Commission correctly concluded that Otis could not raise a diminution-of-safety defense in the contest proceedings below.

## VI.

We agree with the Commission that Otis is an operator subject to regulation under the Mine Act. With regard to the governor

---

9. We need not consider whether there could ever be circumstances so compelling that an operator need not even file a petition in order to preserve a diminution-of-safety defense. The Commission has stated in a footnote in dicta that there may be "emergency" situations so "grav[e]" as to require an "immediate" response before a petition can even be filed. *See Sewell Coal Co.,* 5 F.M.S.H.R.C. 2026, 2029 n. 2 (1983).

*But cf. id.* at 2033 (Lawson, Comm'r, concurring) (rejecting this suggestion). In this case, the record indicates that Otis was aware of its potential Mine Act obligations no later than December 31, 1985. Obviously, it could have at least filed a petition for modification before choosing to disregard the putatively unsafe regulation on October 27, 1986.

rope citation, we agree with the Commission that the ALJ applied the correct legal standard, and that under that standard the record contains substantial evidence to support the citation. With regard to the electrical work citations, we conclude that Otis, by failing to file a modification petition, has waived any diminution-of-safety defense it might otherwise have had in the contest proceedings below and here. The orders of the Commission are therefore

*Affirmed.*