16-2055-ag
*Sec. of Labor v. Cranesville Aggregate Cos., Inc.*

# In the
# United States Court of Appeals
# For the Second Circuit

————————

August Term, 2016

(Argued: May 11, 2017    Decided: December 18, 2017)

Docket No. 16-2055-ag

————————

SECRETARY OF LABOR,

*Petitioner-Appellant*,

V.

CRANESVILLE AGGREGATE COMPANIES, INC., DBA SCOTIA BAG PLANT,

*Respondent-Appellee.*[*]

————————

Before:    LEVAL, POOLER, and HALL, *Circuit Judges.*

————————

The Secretary of Labor (the "Secretary") seeks review of an order of the Occupational Safety and Health Review Commission (the "Commission"), vacating a number of citations for various workplace violations of Occupational Safety and Health Administration ("OSHA") standards.  The Commission concluded that the Occupational Safety and Health Act (the "OSH Act") had no application, and OSHA lacked authority over the cited work conditions, because the work was covered by the Mine Safety and Health Act (the "Mine Act") and therefore subject to regulation by the Mine Safety and Health Administration ("MSHA"), rather than OSHA. In this appeal we are required to decide whether the Secretary's determination that OSHA, rather than MSHA, governed the areas in which the workplace conditions existed.  In so

---

[*] We respectfully request that the Clerk of Court amend the official caption to conform to that above.

doing, we conclude that the Secretary reasonably determined that the cited workplace conditions were subject to OSHA—rather than MSHA—regulation.

REVERSED AND REMANDED.

_____

RONALD J. GOTTLIEB (M. Patricia Smith, Ann S. Rosenthal, Charles F. James, *on the brief*), U.S. Department of Labor, Washington, DC, *for Petitioner*.

WALTER BREAKELL, Breakell Law Firm P.C., Albany, New York, *for Respondent*.

_____

HALL, *Circuit Judge*:

This petition for review arises out of an action brought by the Secretary of Labor against Cranesville Aggregate Companies, Inc. ("Cranesville") to enforce citations for safety hazards that were issued by the Occupational Safety and Health Administration ("OSHA") pursuant to the Occupational Safety and Health Act (the "OSH Act"). The Secretary seeks our review of a decision of the Occupational Safety and Health Review Commission (the "Commission"), which determined that OSHA was without authority over the work in question because that work was subject to the Mine Safety and Health Act (the "Mine Act"), rather than the OSH Act.

Following receipt of complaints and an inspection, the Occupational Safety and Health Administration ("OSHA") issued Cranesville six citations for violations of various OSHA standards found at Cranesville's "Bag Plant" at its sand and gravel operation. Cranesville contested the citations and argued that OSHA's authority over the cited work conditions is governed not by the OSH Act but by Mine Act be-

2

cause the Mine Act gives the Mine Safety and Health Administration ("MSHA") authority to enforce violations at the Bag Plant. After an administrative hearing, an Administrative Law Judge ("ALJ") vacated the citations, concluding that, because MSHA had authority over the cited working conditions, OSHA's standards did not apply to it. The Secretary subsequently sought a petition for discretionary review by the Occupational Safety & Health Review Commission (the "Commission"). Because the two Commissioners remaining on the Commission could not agree on whether the Mine Act or the OSH Act applied to the cited conditions, the ALJ's decision vacating the citations became final.[1]

We conclude that the Secretary reasonably determined that the cited workplace conditions were subject to OSHA regulation. The ALJ therefore erred in determining that the OSHA citations were not enforceable.

The Bag Plant is subject to MSHA authority if it is a "mine" within the meaning of the Mine Act. The Mine Act defines the term "mine" to include structures and facilities used in "milling" minerals. The Mine Act, however, leaves it to the Secretary to define the term "milling." The Secretary's reasonable determination regarding which conditions are to be regulated by MSHA and which by OSHA is entitled to substantial deference. The ALJ gave no deference whatsoever to the Secretary's decision to issue the citations for the Bag Plant violations under the authority of OSHA, but rather imposed his own interpretation of what the Mine Act covered.

---

[1] Normally, the Commission is made up of three Commissioners. *See About OSHRC*, oshrc.gov, https://www.oshrc.gov/about/how-oshrc-works.html (last visited Dec. 12, 2017). At the time of the Commission's decision in this case, however, there were only two Commissioners on the reviewing panel, and at the time of this writing there are currently three Commissioners. *See Current Commissioners*, oshrc.gov, https://oshrc.gov/about/Commissioners_bios.html (last visited Dec. 12, 2017).

For the reasons that follow, the decision of the Commission upholding the ALJ's decision is **REVERSED AND REMANDED**.

## I. BACKGROUND

### A. THE STATUTORY AND REGULATORY FRAMEWORK

This appeal involves the interplay of two federal statutes: the OSH Act and the Mine Act, both administered under the authority of the Secretary of Labor. The Secretary of Labor is authorized to enforce the OSH Act, which is designed to ensure the safe working conditions for every worker in the nation. 29 U.S.C. § 651(b). When Congress enacted the OSH Act, however, certain federal agencies already had authority to regulate occupational safety and health of employees engaged in specific fields. Accordingly, Congress included section 4(b)(1) in its promulgation of the OSH Act. 29 U.S.C. § 653(b)(1). Section 4(b)(1) provides: "[n]othing in this Act shall apply to working conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). Pursuant to this provision, the OSH Act does not apply when (1) another federal agency has statutory authority to regulate the cited working conditions and (2) that other agency has exercised such authority by issuing applicable regulations. *Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235, 241–42 (2002).

The Secretary also has the authority to enforce, through the Mine Safety and Health Administration ("MSHA"), the Mine Act. 30 U.S.C. §§ 801–962. Under the Mine Act, MSHA has jurisdiction to regulate the working conditions at mines, that

is, sites used for extracting, milling, or preparing minerals.[2]  *See* 30 U.S.C. §§ 802(h)(1), 803.  While the Mine Act does not explicitly define the term "milling," it provides that in determining "what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment." *Id.*

Additionally, an interagency Memorandum of Understanding ("MOU") between OSHA and MSHA issued in 1979 further explains what constitutes a mine, subject to MSHA regulation.  The MOU defines "milling" as "the art of treating the crude crust of the earth to produce therefrom the primary consumer derivatives." Joint App'x at 394–95.  The MOU lists "drying" among the processes that can constitute "milling."[3]  Joint App'x at 394–95.  "Drying" is defined as "the process of removing uncombined water from mineral products, ores, or concentrates, for exam-

---

[2] "Coal or other mine" is defined as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. . . .

30 U.S.C. § 802(h)(1).

[3] The ALJ's conclusion that the Bag Plant was a 'mine' depended in part on its finding that sand was dried there, and that this 'drying' constituted mineral milling under the MOU.

ple, by the application of heat, in air-actuated vacuum type filters, or by pressure type equipment." Joint App'x at 395.

The MOU also explains, however, that despite the above definitions, "there will remain areas of uncertainty regarding the application of the Mine Act, especially in operations near the termination of the milling cycle and the beginning of the manufacturing cycle." Joint App'x at 391. It states, moreover, that the "term milling may be narrowed to exclude from the scope of the term processes listed . . . where such processes are unrelated, technologically, or geographically, to mineral milling." Joint App'x at 391. The MOU also clarifies that OSHA may have authority over facilities on mine property when the material from the mine, such as sand, arrives at the plant stockpile or when milling is completed. In evaluating whether a particular process might be considered "mineral milling," and thus covered by MSHA, the Secretary considers a non-exhaustive list of factors, including:

> [T]he processes conducted at the facility, the relation of all processes at the facility to each other, the number of individuals employed in each process, and the expertise and enforcement capability of each agency with respect to the safety and health hazards associated with all the processes conducted at the facility.

Joint App'x at 391.

### B. CRANESVILLE OPERATIONS

Cranesville is a "mine operator" under the Mine Act and operates a sand and gravel mine in Scotia, New York (the "Scotia Mine"). Cranesville produces aggregates from sand and gravel pits and sells the aggregates to its parent company (Cranesville Block Co., Inc.) and other third parties. The Scotia Mine property con-

6

sists of a large quarry pit and a number of related buildings, including buildings located in an area known as "Plant 5," which is adjacent to the quarry pit. Two other related buildings (Buildings 1 and 2) collectively make up the Bag Plant. Both Building 1 and Building 2 contain storage areas, conveyors, and related equipment for "bagging" materials. Building 2 also houses a maintenance shop for repairing mining equipment, and a sand dryer. The quarry pit, Plant 5, and the Bag Plant are part of the same parcel of property, have the same street address, and are all owned by Cranesville.

For our purposes, it is important to identify where certain mining and manufacturing operations are conducted on the property. At Plant 5, which is next to the quarry pit, Cranesville crushes, sizes, and washes excavated material, which is then screened and separated into different sized products, one of which is sand. Sand so produced at Plant 5 is sold in bulk to Cranesville's customers, and a portion is stockpiled. A portion of the sand prepared at Plant 5 is transported from Plant 5 to the Bag Plant to be packaged, either as sand or in combination with concrete or other materials, and sold in bagged form. The Bag Plant is located approximately 600 feet from the quarry pit, separated by railroad tracks that traverse the mine property. A private roadway connects the quarry pit to the Bag Plant. The sand transported from Plant 5 to the Bag Plant for bagging is in the same condition as the sand sold at Plant 5 to Cranesville's customers for bulk sand. At the Bag Plant, the sand is dried and otherwise prepared to be bagged, either separately or in a mixture with concrete and other products. The Bag Plant also received materials from other

Cranesville-affiliated companies and non-affiliated companies. The sand acquired by the Bag Plant from other sources was treated there identically to the sand transferred to the Bag Plant from Plant 5.

At the Bag Plant, excavated material was dumped into a large barrel that has a furnace gun at one end, which would spin and fluff the material to dry and prepare it for its use in concrete. Drying occurred at the Bag Plant twice a week for approximately three hours each day. Drying was a critical part of the bagging operations conducted at the Bag Plant, both because moist sand was difficult to handle, and because concrete, if mixed with moist sand, would harden and be compromised.

In addition to the drying operations, the Bag Plant also housed mining equipment. At the Bag Plant were screens, dryers, elevators, hoppers, and conveyors, as well as equipment for bagging the finished product. The Bag Plant also contained a maintenance shop, in which a small maintenance crew repaired mining equipment, including rock crushers and bucket loaders. While the maintenance crew did not work exclusively at the Bag Plant maintenance shop, they performed some maintenance work on equipment housed there and regularly delivered and removed equipment and other materials from the shop.

### C. OSHA'S INSPECTION AND CITATIONS

In response to an employee complaint, in May of 2009, OSHA initiated a safety inspection of the Bag Plant. Based on the compliance officer's initial observations, OSHA also conducted a health inspection of the Bag Plant. Following the in-

spections, OSHA issued a number of citations for violations of numerous safety and health standards. Cranesville contested the citations, alleging that its operations were outside of OSHA's authority.

Prior to the hearing on the citations, the Secretary and Cranesville entered into a settlement agreement regarding a number of the violations. The total penalty for these violations totaled $42,300. The settlement is contingent, however, on OSHA having authority over the Bag Plant. The remaining citations proceeded to an administrative hearing. The proposed penalties for these violations reached $452,000. The violations concerned electrical hazards, the unsafe operation of forklifts, unguarded elevated platforms, a non-compliant ladder, the lack of personal protective equipment, overexposure to breathable Portland cement, and general housekeeping issues at the Bag Plant. Importantly, none of the alleged OSHA violations dealt with working conditions in the maintenance shop.

During the administrative proceedings hearing, Cranesville argued that OSHA lacked authority over the cited workplace conditions because the Bag Plant operated as a repair facility for mining equipment, and the drying of the sand constituted "milling" under the Mine Act. It was Cranesville's position that OSHA lacked authority over the workplace conditions because they fell within MSHA's authority. Each party presented expert testimony about when drying a mineral might constitute milling under the Mine Act. The experts agreed that sand leaving Plant 5 (including sand delivered to the Bag Plant) was a "finished product." Yet, the two

9

disagreed as to whether the drying of the sand at the Bag Plant could be considered milling.

The Secretary's expert explained that the drying at the Bag Plant was performed to make the end-product easier to handle and prevent the hydration of cement (with which the sand was mixed), and not to upgrade the product to increase its value. The Secretary's expert distinguished between drying that is followed by further milling operations and drying that is incidental to manufacturing processes—such as bagging. The Secretary's expert also explained that the Bag Plant's operations were similar to those of a "ready-mix" cement plant—an operation over which OSHA typically exercises authority.

Cranesville's expert, on the other hand, explained that the drying that took place at the Bag Plant constituted "upgrading" the sand because it was "preparing the product" for commerce. Joint App'x at 348, 359–60. He also testified that the drying process employed at the Bag Plant was similar to other drying operations which were found to make up part of the mining process and therefore was subject to MSHA authority.

Both experts agreed that the maintenance shop housed in the Bag Plant was subject to MSHA authority. The Secretary's expert explained, though, that OSHA maintained authority over other parts of the Bag Plant, since agencies could exercise shared authority over facilities in which maintenance activities are performed. By contrast, Cranesville's expert concluded that because MSHA had authority over the maintenance shop, the entire Bag Plant was rendered subject to MSHA jurisdic-

10

tion. He explained that because MSHA standards were adequate to address the hazards in other parts of the Bag Plant, "convenience of administration" supported regulation of the Bag Plant under MSHA.

### D. THE ALJ'S DECISION

Following a nine-day hearing and post-hearing briefing, the ALJ ultimately vacated the OSHA citations on the grounds that MSHA, not OSHA, had authority over the cited workplace conditions. The ALJ concluded that, although it was not the primary operation, the drying process at the Bag Plant constituted milling under the MOU, bringing the plant under MSHA authority. The ALJ further found that the maintenance shop, which repaired mining equipment and employed maintenance workers who worked in all areas of the mining property, is sufficient, on its own, to bring the Bag Plant within the purview of the Mine Act. In holding that the Bag Plant was within the scope of MSHA's regulatory authority, the ALJ emphasized that "it is the intent of Congress that" any doubts about whether an activity falls under the Mine Act are to be "resolved in favor of inclusion of . . . coverage" under the Act. The Secretary subsequently sought Commission review.

### E. THE COMMISSION'S DECISION

Because the two commissioners could not agree on whether the Bag Plant was covered under the Mine Act or subject to OSHA's jurisdiction, by default, the ALJ's decision became the Commission's final order. Each commissioner wrote to explain her views.

11

Chair Attwood determined that Cranesville failed to meet its burden of establishing that OSHA lacked authority over the cited workplace conditions. She explained that the Mine Act expressly delegated authority to the Secretary to determine what constitutes milling under the Mine Act. The Chair also concluded that the MOU supported the Secretary's determination that the drying at the Bag Plant did not qualify as milling and the performance of maintenance in one room of the Plant was insufficient to bring the entire Plant within the authority of the Mine Act. She concluded that the Secretary had reasonably "draw[n] the line between Cranesville's mining and milling operations on the one hand, and its manufacturing operations on the other." Joint App'x at 116.

In contrast, Commissioner MacDougall concluded that MSHA, not OSHA, had authority over the cited workplace conditions, reasoning that, under the plain meaning of the Mine Act, MSHA had jurisdiction over the Bag Plant because it performed maintenance work on mining equipment in Building 2. Commissioner MacDougall also concluded that the drying process at the Bag Plant was sufficient to bring it within MSHA's authority.

The Secretary of Labor appeals the decision of the Commission affirming the decision of the ALJ.

## II.   DISCUSSION

We will "uphold an order of an administrative agency such as the Commission unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in ac-

12

cordance with the law.'" *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 226 (2d Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)).

It is understood that where, as here, the Secretary "has authority to interpret the statute . . . we . . . defer to the views of the Secretary rather than the Commission." *Id.* at 227. In determining what *level* of deference we owe the Secretary's interpretation of the Mine Act (the statute implicated in this case that provides the exception to OSH Act enforcement), we consider whether "the agency interpretation claiming deference was promulgated in the exercise of [the Secretary's rule-making] authority." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

The Supreme Court has recognized that the Secretary's interpretation of OSH Act regulations—"when embodied in a citation"—"assumes a form expressly provided for by Congress." *Martin v. OSHRC*, 499 U.S. 144, 157 (1991) (citing 29 U.S.C. § 658). In *Martin*, the Court explained that when the Secretary's interpretation takes the form of a citation for violation of safety standards, the Secretary's "litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard." *Id.*; *see also Sec'y of Labor, MSHA v. Nat'l Cement Co. of Cal.*, 494 F.3d 1066, 1073 (D.C. Cir. 2007) ("[I]n the statutory scheme of the Mine Act, the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a . . . health and safety standard, and is therefore deserving of [*Chevron*] deference."). So it is in the case before us.

To be clear, we have previously applied "the more limited deference recognized in *Skidmore*" to the Secretary of Labor's interpretation of the OSH Act where it was "expressed *only* as a position in litigation." *Russell P. Le Frois Builder, Inc.*, 291 F.3d at 227 (emphasis added). In *Russell*, the Secretary articulated the view that "§ 10 of the [OSH] Act does not confer on the Commission the power to excuse late filing pursuant to the terms of Fed. R. Civ. Pro. 60(b)." *Id.* However, unlike Martin or the circumstances presented here, the Secretary had not issued a citation, or otherwise taken this position in "regulations, rulings or administrative practice." *Id.* at 227 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)). Rather, the agency had merely adopted its view as a litigation position. *Id.* Under those circumstances, we concluded that the Secretary's view of the OSH Act was entitled to deference, but only to the more limited deference reflected in *Skidmore*, rather than *Chevron*. Here, however, the Secretary's interpretation of the Mine Act was expressed as more than simply a litigating position—as it was embodied in an OSHA citation.

In this case, the Secretary issued a number of citations for various OSHA violations. By issuing these citations under OSHA, the Secretary has necessarily ruled that the Mine Act does not except the workplace conditions at the Bag Plant from scrutiny under OSHA. That is, the Secretary via the citation and enforcement proceeding has concluded that OSHA, rather than MSHA, had authority over the cited conditions. The Secretary has maintained this position throughout the ensuing litigation. Because the Secretary's interpretation of the Mine and OSH Acts was

14

thereby embodied in a series of citations for safety violations, it is entitled to the deference described in *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Cf. Martin*, 499 U.S. at 157 (concluding that "Secretary's interpretation of OSH Act regulations is an administrative adjudication [and] . . . when embodied in a citation, . . . assumes a form expressly provided for by Congress." (citation omitted)); *Nat'l Cement Co. of Cal.*, 494 F.3d at 1073 (holding *Chevron* deference applies to Secretary's legal determinations under Mine Act, if that position otherwise merits such deference under *Chevron*'s criteria).

Under the *Chevron* two-step framework, we first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, we must then determine whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* at 843. Applying *Chevron* to the circumstances presented by the Bag Plant and sand and gravel operation, at best, it is unclear under the Mine Act when the mining process ends—and thus when MSHA authority terminates and OSHA authority begins—because the operation at the Bag Plant falls somewhere between the termination of the milling cycle and beginning of the manufacturing cycle. Reaching step two, we further conclude that the Secretary's determination that the cited conditions at the Bag Plant were subject to OSHA authority was a reasonable construction of the Mine Act.

15

First, we consider the relevant language of the Mine Act, which provides MSHA with authority over "structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in, or resulting from, the *milling* of [ ] minerals, or the work of preparing coal or other minerals." 30 U.S.C. § 802(h)(1) (emphasis added). While the term "milling" is not explicitly defined under the Mine Act, the Act provides that, in determining what constitutes mineral mining, the Secretary "shall give due consideration to the convenience of administration . . . with respect to the health and safety of miners employed at one physical establishment." *Id.* As our sister circuit has noted, "this [convenience of administration clause] gives the Secretary discretion, within reason, to determine what constitutes mineral milling, and thus indicates that his determination is to be reviewed with deference both by the Commission and the courts." *Donovan v. Caroline Stalite Co.*, 734 F.2d 1547, 1552 (D.C. Cir. 1984). "Section (h)[1] gives the Secretary power—in situations such as this, where the company's operations do not fall exclusively within the province of either mineral 'milling' or 'manufacturing'—to decide which of his agencies will possess enforcement authority over the facility in question." *Id.* at 1553. The convenience of administration clause confirms our conclusion that the Secretary's interpretation of the Mine Act in this case is entitled to *Chevron* deference. *Cf. Mead Corp.*, 533 U.S. at 229 (recognizing "a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed").

16

Having determined that the Mine Act does not unambiguously speak to the issue of what is and is not included in mining operations, we now turn to whether the Secretary's interpretation of the Act was reasonable. In determining whether certain processes constitute milling or manufacturing, the Secretary applies a functional analysis. *See Sec'y of Labor (MSHA) v. Elam*, 4 FMSHRC 5, 7 (1982); *see also* Joint App'x at 391. Under this analysis, the primary focus is the nature of the activities performed at the facility in question. *Sec'y of Labor (MSHA) v. Standard Gravel Co. Inc.*, 34 FMSHRC 3004, 3008 (2012). In addition, when evaluating whether certain operations constitute milling or manufacturing, the Secretary's discretion is guided by the interagency MOU, which—while it includes "drying" as a process that may be considered "milling"—also explains, "There will remain areas of uncertainty regarding the application of the Mine Act, especially in the operations near the termination of the milling cycle and the beginning of the manufacturing cycle." The MOU adds that the "term milling may be narrowed . . . where such processes are *unrelated, technologically, or geographically, to mineral milling*." Joint App'x at 391 (emphasis added). The MOU also clarifies that OSHA may have authority over facilities on mine property when the material from the mine, such as sand, arrives at the plant stockpile or when milling is completed.

Considering the nature of the activity at the Bag Plant, we hold that the Secretary reasonably determined that the Bag Plant operations fall under the OSH Act, and not the Mine Act. The operations at the Bag Plant consisted largely of mixing and bagging sand that was already fully milled and marketable when deliv-

17

ered to the Bag Plant. The activities conducted there, devoted to the bagging of that sand, either separately or in combination with cement and other minerals, was both functionally and geographically distinct from the extracting and milling operations performed at the quarry pit and Plant 5. Bag Plant employees would bag sand that was delivered from Plant 5 (where it was crushed, washed, and screened) as well as a variety of other minerals and materials received from third-party sources, including cement and pre-mix aggregates. The employees also mixed the sand with other aggregates to create cement pre-mix, which was then bagged. Such activities are functionally and, to a significant extent, geographically distinct from the mineral extraction and processing operations performed at other locations of the Scotia Mine.

Moreover, while sand milled at Plant 5 was dried at the Bag Plant, it was dried as part of the manufacturing process for producing cement mix and other surface bonds. At the Bag Plant, Cranesville was essentially operating in its capacity as a manufacturer and not as a mine operator.

Also of note, Cranesville unquestionably performed milling operations at Plant 5, where materials excavated from the quarry were crushed, sized, and washed. *See* Joint App'x at 394 (listing crushing, sizing, and washing as processes that may be considered "milling"). The sand produced from Plant 5 constituted a primary consumer derivative, requiring no further processing to be marketable. *See* Joint App'x at 300–01. Indeed, the sand produced from Plant 5 and delivered to the

18

Bag Plant was indistinguishable from the sand delivered to Cranesville's other customers.

Considering all of these factors, therefore, we conclude that the overall work at the Bag Plant was unrelated to the milling process. The Secretary reasonably concluded that the Bag Plant was not part of the mineral processing operation at the Scotia Mine but rather functioned as a separate manufacturing facility using milled materials delivered from Plant 5. Because MSHA authority generally terminates once the milling process is complete and OSHA's begins at manufacturing, *see* Joint App'x at 396, the Secretary reasonably concluded that OSHA had jurisdiction over the Bag Plant.

Cranesville contends that because "drying" took place at the Bag Plant, the entire bagging operation should be deemed "milling" and thus subject to MSHA authority. It is true that the MOU lists drying as a process that may fall within MSHA regulatory authority. But, drying is merely one factor to consider in the functional analysis. What is more, the MOU discusses that the "term milling may be narrowed to exclude . . . processes [such as drying] where such processes are unrelated technologically, or geographically, to mineral milling." Joint App'x at 391. In determining the application of the Mine Act, the Secretary may consider all processes conducted at the facility and their relation to each other. *See* Joint App'x at 391–92. The Secretary did just that, and we afford his determination considerable deference.

19

Cranesville also contends that, because the maintenance shop was located in Building 2 of the Bag Plant, in which mining equipment was repaired and stored, the entire Bag Plant is subject to MSHA jurisdiction. The ALJ agreed, concluding that the presence of the maintenance shop, in and of itself, was sufficient to bring the entire Bag Plant under MSHA authority. Both Cranesville and the ALJ give short shrift to the fact that the Secretary is authorized to consider the overall nature and characteristics of the Bag Plant in determining whether the Mine Act applies. Indeed, the Secretary does not dispute that MSHA, and not OSHA, has authority over the maintenance shop. *See* 30 U.S.C. § 802(h)(1) (Mine Act authority extends to "structures, facilities, equipment, . . . and other property . . . used in" mining process). Rather, the Secretary asserts that he is authorized to distinguish between mining and non-mining activities. *See, e.g.*, § 802(h)(1) ("convenience of administration" provision). Because the Secretary found that the majority of the operations at the Bag Plant were better construed as manufacturing than milling processes, it was reasonable to conclude that OSHA applied to the cited workplace conditions. *Cf. Standard Gravel*, 34 FMSHRC at 3008–09 ("That a minuscule part of the work it performs is for the benefit of non-mining enterprises is immaterial and does not detract from the finding that the function of the facility is to support [Respondent's] mining activities."); *see also Carolina Stalite*, 734 F.2d at 1551 ("It is clear that every company whose business brings it into contact with minerals is not to be classified as a mine . . . ."). In fact, none of the alleged OSHA violations dealt with working conditions in the maintenance shop.

20

The fact that one portion of the Bag Plant may be subject to MSHA does not defeat the reasonableness of the Secretary's determination as to the cited workplace conditions. As explicated above, because the Secretary has authority to distinguish between mining and non-mining activities for the purposes of enforcement, when the Secretary reasonably applies a functional analysis, the Secretary's determination as to which act governs is entitled to substantial deference. In contravention of *Chevron*, the ALJ does not appear to have given the Secretary's interpretation of the Mine Act any deference at all, instead imposing his own view of what was reasonable. Because the Commission did not afford proper deference to the Secretary's reasonable determination, the Commission's ruling was not in accordance with the law. We therefore reverse the Commission's decision upholding the ALJ's decision and order, and remand for entry of an order upholding the OSHA citations and settlement agreement.

## III.  CONCLUSION

For the foregoing reasons, the decision of the Commission upholding the ALJ's decision and order is **REVERSED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.